157 F.3d 668
 8 A.D. Cases 862, 13 NDLR P 121, 98
Cal. Daily Op. Serv. 6943,
98 Cal. Daily Op. Serv. 7687,
98 Daily Journal D.A.R. 10,833,
98 Daily Journal D.A.R. 9599
 William D. FERGUSON; Elizabeth T. Ferguson; Bonnie P.
Tucker; Jay T. Frankel; Barbara Jean Coffman,
Plaintiffs-Appellants,
v.
CITY OF PHOENIX, a municipality; Lyle Rodabough; Jane Doe
Rodabough, Defendants-Appellees.
 No. 96-17350.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Nov. 4, 1997.
Decided Sept. 3, 1998.
As Amended Oct 8, 1998.
 
 Stanley Ray Watts and Suzanne M. Dohrer, Dohrer & Watts, Phoenix, Arizona, for plaintiffs-appellants.
 Eileen Joan Dennis and William R. Jones, Jr., Jones, Skelton & Hochuli, Phoenix, Arizona, for defendants-appellees.
 Douglas L. Parker, Georgetown University Law Center, Washington, DC, for amicus California Coalition of Agencies Serving the Deaf and Hard of Hearing, Inc., and National Association of the Deaf.
 Susan M. Freeman, Lewis & Roca, Phoenix, Arizona, for amicus National League of Cities, United States Conference of Mayors, League of Arizona Cities and Towns, and International Municipal Lawyers' Association.
 Jessica Dunsay Silver, United States Department of Justice, and Gregory B. Friel, United States Department of Justice, Civil Rights Division, Washington, DC, for amicus United States of America.
 Appeal from the United States District Court for the District of Arizona; Robert C. Broomfield, District Judge, Presiding. D.C. No. CV-95-0260-RCB.
 Before: WOOD,* RYMER, and TASHIMA, Circuit Judges.
 Opinion by Judge WOOD; Dissent by Judge TASHIMA.
 WOOD, Circuit Judge:
 
 
 1
 Plaintiffs, who are deaf or hearing impaired, in lieu of the common telephone must rely on telecommunications devices (TDDs). TDDs are considered standard communication equipment for those with a hearing disability in order to enable them to communicate by telephone, including making 9-1-1 emergency system calls. Three separate lawsuits, later consolidated, seeking declaratory, injunctive and damages relief, were filed in February 1996 by plaintiffs against the City of Phoenix (City). The City was alleged to have operated its 9-1-1 emergency service in a way which discriminated against individuals with plaintiffs' hearing disabilities in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq. ("Title II"); Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 794 and 794(a)(" § 504"); and 42 U.S.C. § 1983. Additionally named as defendant in his individual capacity was Lyle Rodabough, Commander of the Phoenix Police Department's Communication Bureau.[1]
 
 
 2
 The district court granted summary judgment to defendants after concluding that compensatory damages were not available in cases of unintentional discrimination. Plaintiffs appeal.[2]
 
 BACKGROUND
 
 3
 Plaintiffs allege that the City's 9-1-1 emergency system did not respond effectively, if at all, to plaintiffs' TDD emergency calls. The use of a TDD to communicate is similar to the use of electronic mail. Each party must be equipped, the caller and the called, with a TDD which has a typewriter-like keyboard and a screen. The TDD caller types a message which can be transmitted by telephone line to the recipient's TDD screen. Most TDDs have a space bar feature which causes the emission of an audible signal at the receiving end of the line when the caller presses it. Not all TDD machines, however, emit an audible signal.
 
 
 4
 Prior to 1995, under the City's 9-1-1 system, a TDD caller was required to press the space bar when initiating a 9-1-1 call. The emergency operator who received a TDD call was expected to recognize it as a TDD call by the audible signal. If that operator was equipped with a TDD, he could then respond. If the operator was not TDD-equipped, the call was switched manually to a TDD-equipped operator for a response. Sometimes, it is explained, the audible signal was not recognized by the operator or there was no audible signal as the caller neglected to press the space bar.
 
 
 5
 Generally, when TDD users initiate telephone calls, they dial a telephone number and then wait for the person receiving the call to answer the call by typing "GA," meaning "go ahead." The callers do not begin typing a message until they receive the go ahead from the person receiving the call. Under the City's old 9-1-1 system, if a caller did not press the space bar when initiating an emergency call or if the operator did not recognize the audible signal as a TDD call, the call would be treated as a 9-1-1 hang-up. The City's hang-up policy was for the operator to disconnect the 9-1-1 call and then try to call back. If the operator was unable to contact the caller, the police as a precaution were dispatched to the place where the 9-1-1 call had originated to check on a possible emergency situation, but on a less priority basis than a call for a known emergency. It is claimed that the City in a year receives approximately two million 9-1-1 emergency system calls, of which only a very small percentage are TDD calls.
 
 
 6
 The significance of an alleged lack of an effective 9-1-1 response from the City can be better understood by briefly setting forth some of the 9-1-1 experiences alleged by plaintiffs, although fortunately none had tragic consequences. Plaintiff Ferguson, for example, early in the morning saw two suspicious figures outside his family home. He used his TDD to call 9-1-1 four times for help, but each time he was disconnected. When Ferguson saw the prowlers break into his pickup truck and drive it away, he gave up on 9-1-1 and chased after the thieves himself. The police arrived, but too late to help.
 
 
 7
 Ferguson's complaints to the City resulted in an explanation by Commander Rodabough that Ferguson had not been disconnected, but in three of his four 9-1-1 calls he had failed to use his TDD space bar correctly to alert the operator. His fourth call, it was claimed, was answered and the 9-1-1 operator sent him a message, but Ferguson himself failed to respond, possibly because he was already out in the street chasing after his truck. During another incident later that same year Ferguson was unable to promptly report vandalism in progress next door to his home though he claimed he had used the 9-1-1 system correctly. He blamed his 9-1-1 problem on the lack of adequate training of the City's 9-1-1 personnel.
 
 
 8
 Plaintiff Bonnie Tucker is deaf, as is her father. On one occasion, when Tucker's father was seriously ill, he attempted to contact 9-1-1 by his TDD for what he believed was a medical emergency. His call did not receive a response. Plaintiff Tucker placed another 9-1-1 call and also got no response. On her second attempt, she was able to communicate with the 9-1-1 operator. At that time, Tucker notified the City of their 9-1-1 difficulties. At the request of the City she undertook to test their TDD system again. The system failed to work during her first two test calls, but functioned on the third call.
 
 
 9
 Plaintiff Frankel also had 9-1-1 problems. On one occasion in 1995, Frankel unsuccessfully attempted to call 9-1-1 five times on his TDD to report a theft from his residence. City officers did arrive at Frankel's residence in accordance with their hang-up response policy; however they did so on the non-emergency response basis. While the officers were at Frankel's residence a 9-1-1 test call was made, but that call was likewise disconnected. Frankel's prime concern was for his father who lived with him and who had a serious heart condition which might cause need for an emergency 9-1-1 response.
 
 
 10
 Plaintiffs filed a complaint against the City, alleging that the City's 9-1-1 system ineffectively served the deaf. Plaintiffs claimed that this conduct violated Title II of the ADA, § 504 of the Rehabilitation Act, and § 1983. The City responded to plaintiffs' complaint with a motion for summary judgment. Partial summary judgment was granted to the City on plaintiffs' § 1983 claims on the basis that municipalities are immune from punitive damage under that section. Ferguson v. City of Phoenix, 931 F.Supp. 688, 698 (D.Ariz.1996) (citing City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 271, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981)). The district court denied the remainder of defendant's summary judgment motion on the merits. Id. at 693-98. The district court held that plaintiffs could not recover compensatory damages unless they could prove that the City intentionally discriminated against them. This standard was defined by the district court to include conduct which could be viewed as intentional if the City, at a minimum, acted with deliberate indifference in situations where there was a strong likelihood that the City's conduct could result in a violation of federally protected rights. Id. at 697. Appropriate discovery, the district court held, was to be permitted for plaintiffs to explore the issue. The court, however, found that the plaintiffs up to that point had failed to show any intentionally discriminating conduct or deliberate indifference whatsoever. Id.
 
 
 11
 Plaintiffs claimed the whole factual background of their case evidenced intentional discrimination. In general, they blamed the City's official policies and practices as well as the City's alleged continuing and knowing violations of plaintiffs' civil rights for more than a year. In particular, plaintiffs' allegations were that only deaf callers had to use a TDD space bar and thereby were treated differently than non-hearing impaired callers; sometimes the 9-1-1 TDD system did not function for them; only TDD 9-1-1 calls had to be transferred on occasion to a 9-1-1 ancillary operator position equipped with TDD capability, slowing down the 9-1-1 process; the 9-1-1 TDD training of operators to recognize and respond to TDD calls was inadequate; the City neglected to perform the necessary self-evaluation of its TDD system; the City neglected to take corrective action after it knew of the deficiencies; and finally, that Commander Rodabough had failed to take any corrective actions before a partial settlement consent order was entered during the course of this litigation. Those allegations were enough, plaintiffs claimed, to show intentional discrimination, if an intentional showing was necessary which plaintiffs now dispute, and consequently were enough to justify compensatory and punitive damages. Plaintiffs' complaint alleged intentional and deliberate discrimination, and plaintiffs argued that intentional discrimination was shown, but now on appeal plaintiffs claim they are presumptively entitled to damages for unlawful discrimination without regard to intent under the ADA, the Rehabilitation Act, or § 1983.
 
 Title II of the ADA provides:
 
 12
 [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.
 
 
 13
 42 U.S.C. § 12132.
 
 
 14
 Section 504 of the Rehabilitation Act provides:
 
 
 15
 No otherwise qualified handicapped individual in the United States ... shall, solely by reason of his handicap, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance....
 
 
 16
 29 U.S.C. § 794.
 
 
 17
 To help effectuate these statutory mandates the Department of Justice (DOJ) under the authority of 42 U.S.C. § 12134(a) promulgated regulations regarding the responsibilities of state and local government to disabled persons, including the deaf or hard of hearing. Those regulations require that "[t]elephone emergency services, including 911 services, shall provide direct access to individuals who use TDD's and computer modems." 28 C.F.R. § 35.162. The regulations further provide that a public entity shall "take appropriate steps to ensure that communications with applicants, participants, and members of the public with disabilities are as effective as communications with others." 28 C.F.R. § 35.160(a). See also 28 C.F.R. § 35.161 (stating that where a public entity communicates with the public by telephone, TDDs must be used to allow communication with the hearing impaired). Further, public entities are required, if necessary, to make "reasonable modifications" in their services to accomplish these goals, 28 C.F.R. § 35.130(b)(7), or to provide new facilities. 28 C.F.R. § 35.151. The DOJ, deeming its regulations needed interpretation, published The Americans with Disabilities Act: Title II Technical Assistance Manual, Nov. 1993 & 1994 Supp. ("Manual"). The Manual specifically prohibits the space bar policy utilized by the City:
 
 
 18
 Additional dialing or space bar requirements are not permitted. Operators should be trained to recognize incoming TDD signals and respond appropriately. In addition, they also must be trained to recognize that "silent" calls may be TDD or computer modem calls and to respond appropriately to such calls as well.
 
 
 19
 Manual, II-7:3100 at 42.
 
 
 20
 In its order on defendants' first motion for summary judgment, the district court found the DOJ interpretations of the statutes and its regulations to be reasonable. Ferguson, 931 F.Supp. at 695. The district court noted that, in 1994, the Mayor of Phoenix had been sent a letter from the Department, but that it only generally advised of the Department's ADA regulations. Id. at 697. The letter made no specific mention of space bars being outlawed, nor had the DOJ's view of the binding nature of the provisions of its Manual been pointed out to City officials. Id. The court viewed the Department's letter as only encouraging, not requiring, the City to make 9-1-1 changes. The court found no evidence that the City actually knew of the binding nature of the Manual's requirements and noted that plaintiffs were disregarding the other qualities of the City's 9-1-1 system and the City's efforts to address their concerns. Id.
 
 
 21
 After the court's decision on defendants' first motion for summary judgment, the parties entered into a consent decree, settling the injunctive issues, but leaving unresolved the question of damages. The settlement among other things required the City to eliminate the need for TDD callers to use a TDD space bar to gain access to the 9-1-1 system. The City's 9-1-1 system consequently has now been improved, and we are aware of no continuing problems.
 
 
 22
 The lawsuit continued on the question of damages. Following discovery by plaintiffs, the parties filed cross motions for summary judgment. The court found no evidence of intentional City discrimination or deliberate indifference and entered final judgment barring compensatory damages under the statutes. That being so, punitive damages were not considered. The court added that although there was no basis for damages against Commander Rodabough that he, in any event, was entitled to qualified immunity.
 
 ANALYSIS
 
 23
 As we review the summary judgment rulings of the district court and its interpretation of the statutes we do so de novo. Forsyth v. Humana, Inc., 114 F.3d 1467, 1474 (9th Cir.), cert. denied, --- U.S. ----, 118 S.Ct. 559, 139 L.Ed.2d 401 (1997); Allen v. Shalala, 48 F.3d 456, 457 (9th Cir.1995).
 
 
 24
 The principal question remaining in this appeal is whether a showing of intentional discrimination is a prerequisite to the recovery of damages by plaintiffs when violations of the ADA and the Rehabilitation Act have occurred. Plaintiffs argue that compensatory damages are presumptively available to them for the City's alleged violation of their federally-protected rights, relying on Franklin v. Gwinnett, 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992). The presumption is based on the doctrine, plaintiffs argue, that "the right to recover the damages from the party who violated the statute" is essential "to make good the wrong done." See Franklin, 503 U.S. at 66, 112 S.Ct. 1028. The plaintiffs fault the district court for not citing Franklin and taking it into consideration before entering summary judgment for the City denying damages. We shall examine Franklin in due course.
 
 
 25
 In opposition to plaintiffs' view, the City argues that there must first be proof of intent to discriminate before damages are appropriate. The City relies on Guardians Association, etc., et al., v. Civil Service Commission of New York, et al., 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983).
 
 
 26
 The district court granted plaintiffs injunctive relief which remedied the 9-1-1 violations. Plaintiffs concede in their reply brief that no Supreme Court opinion directly addresses the discrete issue of whether intent is required to recover damages from a public entity under the ADA or the Rehabilitation Act. That being so we must, with caution, find our way, relying on what other guidance may be available.
 
 
 27
 By statute, the remedies for violations of the ADA and the Rehabilitation Act are co-extensive with each other, 42 U.S.C. § 12133; 29 U.S.C. § 794a(a)(2), and are linked to Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, et seq. These statutes require that ADA and Rehabilitation Act remedies be construed the same as remedies under Title VI. States are no longer immune from damages. 42 U.S.C. § 2000d-7(a)(2).
 
 
 28
 We begin our analysis with a consideration of Title VI. Damages are available under Title VI, but the statute is silent about the possible need for proof of discriminatory intent. Plaintiffs argue that Franklin v. Gwinnett, 503 U.S. 60, 70-71, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992), makes clear that compensatory damages are available regardless of proof of intentional discrimination. Franklin, however, dealt with intentional violations and no mention is made in Franklin of damages for other than intentional violations. Franklin reiterates the general rule that "absent clear direction to the contrary by Congress, the federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute." Franklin, 503 U.S. at 70-71, 112 S.Ct. 1028. Franklin 's statement of that general rule comes at the conclusion of the court's discussion about damages being available for intentional violations. That general rule in the Franklin context, however, cannot fairly be broadened to be a precedent for allowing damages for conduct other than intentional. Cf. Gebser v. Lago Vista Indep. School Dist., --- U.S. ----, 118 S.Ct. 1989, 1999, 141 L.Ed.2d 277 (1998) ("[I]n the absence of further direction from Congress ... we hold that a damages remedy will not lie under Title IX unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond."). That is so even though there is no clear statutory direction from Congress governing the damage issue. Cf. Id. Franklin does not explain what relief may be appropriate in cases of unintentional violations, so we must turn our analysis elsewhere.
 
 
 29
 Franklin cites Guardians Association, etc., et al. v. Civil Service Commission of the City of New York, et al., 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983), which we now examine. Guardians is comprised of a number of concurrences and dissents, but that does not mean it is not useful. From Guardians comes the majority message that in the absence of proof of discriminatory animus, compensatory relief should not be allowed under Title VI. Guardians, 463 U.S. at 607 n. 27, 103 S.Ct. 3221.
 
 
 30
 Appellants argue that Guardians is distinguishable and not applicable because Title VI was enacted under the Spending Clause of the Constitution and is therefore subject to different considerations than the ADA and the Rehabilitation Act. While it is correct that Title VI was enacted under the Spending Clause, it does not necessarily follow, as appellants claim, that only in Spending Clause cases, not others, are compensatory damages to be limited to intentional violations. Moreover, as discussed above, Title II and § 504 are expressly linked to Title VI. Appellants also question the validity of Guardians post-Franklin. However, the Court in Franklin acknowledged Guardians and left it intact. Franklin, 503 U.S. at 70, 112 S.Ct. 1028. See also Gebser, 118 S.Ct. at 1998 (citing Franklin and Guardians together and discussing Guardians without suggesting that it has been overruled or undermined); Lane v. Pena, 518 U.S. 187, 116 S.Ct. 2092, 2096, 135 L.Ed.2d 486 (1996) (citing Franklin for the interpretation that a "clear majority" of the Court in Guardians confirmed that damages were available for intentional violations of Title VI). Therefore, Franklin must be read as consistent with Guardians. Franklin reiterates that in the absence of Congressional statement to the contrary, "all appropriate remedies" are available to plaintiffs. The holding in Franklin merely states that compensatory damages are available for intentional violations of Title IX. That holding is consistent with the holding in Guardians and with our holding today that compensatory damages are not available under Title II or § 504 absent a showing of discriminatory intent.[3] Plaintiffs argue that intentional discrimination will, by the nature of things, usually be impossible to discern and prove. Hopefully, that difficulty of proof is because any intentional discrimination against the hearing impaired, being abhorrent, would be most rare.
 
 
 31
 Substantial corrective remedies are available to plaintiffs, however, regardless of intent. In the present case, equitable relief is sufficient to remedy the problem. The principal purpose of this litigation as evidenced by the prayers for relief was to gain declaratory and permanent injunctive relief compelling compliance with the ADA and the Rehabilitation Act. The corrective action has already been taken by the City, so the basic problem itself has been solved.[4]
 
 
 32
 The district court found no intentional violations, even saying that plaintiffs' evidence "is hardly the stuff of intentional conduct or deliberate indifference." Ferguson, 931 F.Supp. at 697. Later in the litigation, plaintiffs were given discovery opportunities to try to establish intentional discrimination. Although the plaintiffs did not receive all the discovery they desired, most of their discovery demands were reasonably responded to by the City. In some instances what plaintiffs sought either did not exist, or would have been unduly burdensome without any likely value to plaintiffs worth the effort in these circumstances. We find no clear abuse of discretion in the district judge's discovery rulings.
 
 
 33
 The district court held that in order to show intentional discrimination, the plaintiffs had to show that the City had been "deliberately indifferent to the strong likelihood that their action or inaction was violating plaintiffs' federally protected rights." In so doing, the court utilized a "deliberately indifferent" standard in place of the "discriminatory animus" test laid out in Guardians. Guardians, 463 U.S. at 584, 103 S.Ct. 3221. In the present case, we need not determine which standard is proper, since plaintiffs' claims fail under either one. In light of the evidence in the record, the situation clearly appears to be no more than at times some not uncommon bureaucratic inertia as well as some lack of knowledge and understanding about the DOJ Manual's requirements. There is nothing to show, even suggest, any deliberate indifference or discriminatory animus on the part of the City towards plaintiffs.
 
 
 34
 There is a factual dispute between the parties as to whether or not the TDD technology had previously been available for acquisition by the City to avoid the space bar requirement, or that the City even knew about it. It is claimed the City was given notice of the alleged deficiencies by plaintiffs and others, but even so any evidence of deliberate indifference or discriminatory animus is totally lacking. Complaints about the City's 9-1-1 problems appear to have been only sporadic and little different from what other municipalities have experienced when trying to install and operate an emergency system for the benefit of the public. While this suit was in progress improvements were being made. Operators did receive repeated training, but human error mishaps, the City reasonably argues, are to be expected from time to time. We find nothing to suggest that the City received alleged numerous and repeated complaints to which it did not respond. In fact, the evidence was to the contrary. The district court in its final order noted that a witness who was a former 9-1-1 TDD trainer for the Arizona Counsel for the Hearing Impaired, a state agency, had received "sporadic" complaints about 9-1-1 access, but could not recall how many of those were about the City's 9-1-1 service. The TDD trainer further averred that when she did contact the City about a 9-1-1 complaint it was checked by the City's 9-1-1 Center and a follow-up was always done. The district court found that there were no genuine issues of material fact in dispute which under the common summary judgment standard would preclude summary judgment in favor of the City and Commander Rodabough, nor do we. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).
 
 
 35
 The district judge also found there was no actual showing of inadequate training and nothing to put the City on notice of any inadequacy. Further the court found there was internal self-investigation into the level of its 9-1-1 service followed by diligent effort by the City to upgrade its service. We see no bad faith on the part of the City, nor did the district judge. As Justice White acknowledges in Guardians, "[i]t is not uncommon in the law for the extent of a defendant's liability to turn on the extent of his knowledge and culpability." Guardians, 463 U.S. at 597 n. 20, 103 S.Ct. 3221; see also Gebser, 118 S.Ct. at 1999 (requiring, under Title IX, a showing of actual notice and then deliberate indifference by one with the authority to respond in order to recover damages). That knowledge may be clearer under Spending Clause legislation due to the conditions imposed and accepted in advance of receiving government financial assistance. Id. at 596, 103 S.Ct. 3221. In the present case, that knowledge on the part of the City was not shown to support a discrimination charge. There was no discrimination shown to qualify plaintiffs for damages even as it was defined in part by the district court to mean "deliberate indifference."
 
 
 36
 It can be seen from the foregoing discussion that Commander Rodabough is no more liable for damages than is the City. The district court held, however, that Commander Rodabough was entitled to qualified immunity. We review this decision de novo. Elder v. Holloway, 510 U.S. 510, 516, 114 S.Ct. 1019, 127 L.Ed.2d 344 (1994). To determine if an individual is entitled to qualified immunity, we must determine (1) the specific right allegedly violated; (2) whether this right was so "clearly established" as to alert a reasonable officer to its constitutional parameters; and (3) whether a reasonable officer could have believed that the conduct was lawful. Kelley v. Borg, 60 F.3d 664, 666 (9th Cir.1995) (citation omitted). In the present case, the right allegedly violated was the right of deaf 9-1-1 users to be free of the space bar policy when that policy was expressly prohibited by the DOJ Manual. The merits of that decision are not before us. Rodabough could not have been held to understand the law and its requirements at a time when the law was only developing. In its final order, the court noted that both parties had urged the court to publish its earlier order because it was the first court in the country to recognize the binding legal effect of the DOJ's manual. Therefore, we conclude that the right at issue was not clearly established, and as a result, Commander Rodabough was entitled to qualified immunity.
 
 
 37
 Because of the district court's careful consideration of all the evidence, the erroneous impression might be given that it was in fact a bench trial masquerading as summary judgment, but that is not the case. It was a proper use of summary judgment. Appellants, although unsuccessful as to damages, nevertheless made a good and diligent effort in trying to justify damages in addition to the other substantial relief they did achieve.
 
 
 38
 The judgment of the district court must be AFFIRMED.
 
 TASHIMA, Circuit Judge, dissenting:
 
 39
 I respectfully dissent from the majority's holding that compensatory damages are not available under Title II of the Americans With Disabilities Act (ADA) without a showing of discriminatory intent. Maj. op. at 674-675.[1]
 
 
 40
 It has been established that compensatory damages are available for intentional violations of Title VI. See Franklin v. Gwinnett County Pub. Schs., 503 U.S. 60, 70, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992) (citing Guardians Ass'n v. Civil Serv. Comm'n, 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983)). Damages, therefore, are also available for violations of section 504 of the Rehabilitation Act (§ 504) and Title II of the ADA. See 29 U.S.C. § 794a(a)(2); 42 U.S.C. § 12332. The majority accepts the argument of defendant City of Phoenix (City) that if a Title VI plaintiff must prove intentional discrimination in order to recover damages, a Title II plaintiff also must do so. Congress, however, has never indicated an intent to limit compensatory damages relief under Title II to only those plaintiffs who can prove that a discriminatory intent motivated the violator.
 
 
 41
 In Franklin, the Supreme Court noted the "longstanding rule" that "absent clear direction to the contrary by Congress, the federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute." 503 U.S. at 66, 70-71, 112 S.Ct. 1028. The Court held that damages were available under Title IX of the Education Amendments of 1972. It ruled that "we presume the availability of all appropriate remedies unless Congress has expressly indicated otherwise." Id. at 66, 112 S.Ct. 1028. Although Franklin involved an allegation of intentional discrimination, the Court did not limit its general holding to cases of intentional discrimination. The Court, however, did indicate that it may be inappropriate to award damages in the absence of discriminatory intent where a violation is of Spending Clause legislation. Id. at 74-75, 112 S.Ct. 1028.
 
 
 42
 The Supreme Court revisited Franklin in Gebser v. Lago Vista Indep. Sch. Dist., --- U.S. ----, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998). There, it stated that because "the private right of action under Title IX is judicially implied, we have a measure of latitude to shape a sensible remedial scheme that best comports with the statute." Id. 118 S.Ct. at 1996. The Court concluded that a victim of sexual harassment could not recover damages from a school district due to the "contractual nature" of Title IX, unless school officials had actual knowledge of the discrimination and were deliberately indifferent to it.
 
 
 43
 Gebser's decision not to permit damages in a Title IX case under a theory of respondeat superior liability or constructive notice is clearly distinguishable from this case for several reasons. First, this is not a respondeat superior case. Here, the City's liability arises from its own acts and official policies. Second, Title II, unlike Title IX, is not Spending Clause legislation. Third, here, the private right of action is not judicially implied.[2] Gebser, however, also noted that Franklin 's "general rule" in favor of all appropriate relief "yields where necessary to carry out the intent of Congress or to avoid frustrating the purposes of the statute involved." Id. 118 S.Ct. at 1996 (quotations omitted). According to Franklin and Gebser, damages presumptively should be available in this case unless either Congress expressly limited the remedies available under Title II to instances of "intentional" discrimination, or permitting damages in the absence of a discriminatory intent would frustrate the purposes of Title II.
 
 
 44
 There is no "clear direction from Congress" in the text of Title II that it intended to limit the available remedies. Title II remedies are coextensive with those available under section 505 of the Rehabilitation Act.[3] 42 U.S.C. § 12133. Section 505, in turn, provides that "[t]he remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964" are available. Title VI does not have a remedies provision, but its judicially implied remedies were already well-established by the time the ADA was enacted in 1990. See Cannon v. University of Chicago, 441 U.S. 677, 710-11, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) (When it passed Title IX in 1972 "Congress was under the impression that Title VI could be enforced by a private action."). Title II prohibits disability discrimination by public entities. Title VI prohibits racial discrimination by any program or activity receiving federal funds. Section 504, like Title VI and Title IX, but unlike Title II of the ADA, is limited to recipients of federal funds. "By incorporating one section after another by reference--sections that mesh only imperfectly--Congress could not have made its meaning less clear." Tyler v. City of Manhattan, 118 F.3d 1400, 1409 (10th Cir.1997) (Jenkins, J., dissenting).
 
 
 45
 What is evident is that if Congress had intended to limit the availability of remedies under Title II, it would have done so as it did with Title III of the ADA. See id. at 1412. Title III relies on the remedies available in Title II of the Civil Rights Act of 1964. 42 U.S.C. § 12188(a)(1). Title II of the Civil Rights Act explicitly limits relief to "preventive relief." 42 U.S.C. § 2000a-3(a). Compare 42 U.S.C. § 12133 with 42 U.S.C. § 12188(a)(1).
 
 
 46
 The legislative history also indicates that several key members of Congress assumed that damages would be available for Title II violations. See Tyler, 118 F.3d at 1411-14 (Jenkins, J., dissenting) (summarizing legislative history). Senator Harkin, the ADA's chief sponsor in the Senate, stated:
 
 
 47
 [Under titles I & III of the ADA], the bill expressly limits relief to equitable remedies. However, title II of the act, covering public services, contains no such limitation. Title II of the bill makes available the rights and remedies also available under section 505 of the Rehabilitation Act, and damages remedies are available under that provision enforcing section 504 of the Rehabilitation Act and, therefore, also under title II of this bill.
 
 
 48
 135 Cong. Rec. S10742, S10760 (Sept. 7, 1989). In the House Report, Congress indicated a concern over what remedies would be available to make Title II effective in combatting discrimination. See H.R.Rep No. 101-485(II) & (III) reprinted in 1990 U.S.C.C.A.N. 303, 322, 381, 445, 475. The Report notes: "As with section 504, there is also a private right of action [under Title II] for persons with disabilities, which includes the full panoply of remedies." Id. at 381. Franklin indicates that the law always has been that all appropriate remedies are available unless Congress has said otherwise. Therefore, Congress would have expressly limited Title II's remedies when it passed the ADA in 1990, if such a limitation were intended. Instead, the "full panoply of remedies" were intended to be available to victims of disability discrimination when Title II was violated.
 
 
 49
 While Title VI remedies determine which remedies are available under Section 505 and Title II, it does not necessarily follow that, because damages are "inappropriate," absent intentional discrimination under Title VI, that is true for Title II. As mentioned above, Title II, unlike Title VI, was not enacted pursuant to the Spending Clause. In Guardians, Justice White reasoned that the Pennhurst presumption that "only limited injunctive relief should be granted for unintended violations of statutes passed pursuant to the spending power" applied to Title VI. 463 U.S. at 602, 103 S.Ct. 3221 (citing Pennhurst State Sch. & Hosp. v. Halderman, 451 U.S. 1, 15, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981)). See also Gebser, 118 S.Ct. at 1996-2000. In Guardians, a disparate impact discrimination case, the Court was concerned that where a federal funds recipient "unintentionally" discriminates on the basis of race, the recipient may not be aware of its obligations under a voluntary Title VI program. See 463 U.S. at 602, 103 S.Ct. 3221. In Franklin, the Court stated that "the point of not permitting monetary damages for an unintentional violation is that the receiving entity of federal funds lacks notice that it will be liable for a monetary award." 503 U.S. at 74, 112 S.Ct. 1028. In Gebser, the Court rejected a damages remedy where there was no actual knowledge by school officials of the independent discriminatory acts of a teacher. While considerations regarding notice and the "contractual nature" of Spending Clause legislation apply to Title VI, Title IX, and § 504 cases, Title II compliance is not required only of recipients of federal funds. It bears repeating that the ADA was not enacted under the Spending Clause.
 
 
 50
 In light of the affirmative duties imposed by the ADA on state and local governments to accommodate the disabled, I also do not think that the purpose of Title II is frustrated by permitting damages where the discriminatory behavior resulted not from animus but from "bureaucratic inertia" or a "lack of knowledge and understanding of the law." As the legislative history demonstrates, Congress did not intend that complete relief would be available to a disabled individual denied access to public services only where it is shown that a public entity failed to make the required accommodations out of animus or bad-faith. Congress, the Supreme Court, and this circuit have recognized that discrimination against men and women with disabilities often results from thoughtlessness or a reluctance to employ the required resources to ensure accessibility, rather than from animus. See Alexander v. Choate, 469 U.S. 287, 295-298, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985) (discussion of Congressional intent behind § 504); Smith v. Barton, 914 F.2d 1330 (9th Cir.1990). Stating that there are "reasons to pause before too quickly extending even the first prong of Guardians to section 504," the Supreme Court noted:
 
 
 51
 Discrimination against the handicapped was perceived by Congress to be most often the product, not of invidious animus, but rather of thoughtlessness and indifference--of benign neglect.
 
 
 52
 Alexander, 469 U.S. at 295, 105 S.Ct. 712 (1985). This circuit has recognized that "it would be a rare case indeed in which a hostile discriminatory purpose or subjective intent to discriminate solely on the basis of handicap could be shown." Smith, 914 F.2d at 1340.
 
 
 53
 As the government points out in its amicus brief, the "disparate treatment" and "disparate impact" labels borrowed from the Title VI jurisprudence do not adequately define the contours of disability discrimination. Congress found that intentional discrimination was only one of a variety of forms that disability discrimination takes. In Title II's statement of findings and purpose, Congress stated:
 
 
 54
 [I]ndividuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failures to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs or other opportunities[.]
 
 
 55
 42 U.S.C. § 12101(5). To combat some of these unintentional discriminatory effects, Title II imposes affirmative obligations on public entities to make "reasonable modifications" in their policies and facilities to ensure that the deaf have effective and direct access to 911 emergency services. 28 C.F.R. § 35.161-62. A failure to make such reasonable accommodations results in discriminating against the disabled. In Bartlett v. New York State Bd. of Law Examiners, 970 F.Supp. 1094, 1149 (S.D.N.Y.1997), the court held that "intentional" discrimination occurred under section 504 where the defendants erred in deciding that the plaintiff was not disabled. The court stated:
 
 
 56
 [I]ntentional discrimination is shown by an intentional, or willful, violation of the Act itself. With this understood, it becomes clear, that while the defendants may have had the best of intentions, and while they may have believed themselves to be within the confines of the law, they nevertheless intentionally violated the ADA and the Rehabilitation Act by willfully withholding from the plaintiff the reasonable accommodations to which she was entitled under the law.
 
 
 57
 Id. at 1151 (emphasis added). In Bartlett, the violation was "intentional" because the defendants intentionally refused to make an accommodation requested by the plaintiff. The City's actions were no less problematic here, in light of the City's legal duty to provide deaf residents with effective access to 911 emergency services. In spite of its knowledge that such effective services were not being provided, the City refused to take corrective action until this action was filed. Here, the City was under a legal obligation not to impose a space bar requirement, but did so anyway. The City claims that it did not know that the "no space bar" requirement in the Department of Justice's (DOJ) Technical Assistance Manual was binding. Ignorance, however, should not excuse liability for compensatory damages that result from a municipality's violation of Title II. See Owen v. City of Independence, 445 U.S. 622, 654, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980) (no immunity under 42 U.S.C. § 1983 for good faith constitutional violations).[4] This violation of the ADA by the City is a sufficient basis to require it to compensate the plaintiffs for any damages that resulted from the City's Title II violations.
 
 
 58
 I am persuaded that proof of intentional discrimination on the basis of disability is not a prerequisite to the recovery of compensatory damages under Title II of the ADA. The majority's contrary holding, that a Title II plaintiff must prove discriminatory intent, erects a near-insurmountable wall against the recovery of compensatory damages under the ADA. I, therefore, respectfully dissent. I would reverse the district court's summary judgment in favor of the City, and remand for a trial on compensatory damages.[5]
 
 
 
 *
 The Honorable Harlington Wood, Jr., Senior United States Circuit Judge for the Seventh Circuit, is sitting by designation
 
 
 [1]
 Plaintiffs also named defendant Rodabough's wife as a defendant, which they assert is required in order to comply with Arizona community property laws
 
 
 [2]
 This court has had the benefit of amicus briefs of the United States National Association of the Deaf jointly with the California Coalition of Agencies Serving the Deaf and Hard of Hearing, Inc., supporting plaintiffs. The Arizona Center for Disability Law filed a two-page letter as amicus curiae also in behalf of plaintiffs. The National League of Cities, together with United States Conference of Mayors, League of Arizona Cities and Towns, International Municipal Lawyers' Association, and in addition thirty-two member cities of the California League of Cities filed amicus briefs in behalf of the defendants
 
 
 [3]
 We find that in the two other circuits where this issue has been specifically considered it has been held that compensatory damages are not available for unintentional violations of the Rehabilitation Act. Wood v. President and Trustees of Spring Hill College, 978 F.2d 1214 (11th Cir.1992); Carter v. Orleans Parish Pub. Schs., 725 F.2d 261 (5th Cir.1984)
 
 
 [4]
 Fortunately, the sometimes inadequate 9-1-1 system for these plaintiffs in their particular circumstances was not as serious a problem as it might otherwise have been. While plaintiffs claim "extreme frustration, humiliation and emotional distress," which is understandable, they showed no specific or particularized damages in opposition to the City's motion for summary judgment, except for the fact that Ferguson's stolen truck was not recovered. Although there is no evidence that it was not insured, if it were, that loss as well as the damages that others could prove would, of course, be compensable if intentionally inflicted
 
 
 [1]
 The majority leaves open the question of what will suffice as a showing of an intentional violation--whether a "discriminatory animus" must be shown, or a showing of "deliberate indifference" is sufficient. Maj. op. at 675
 
 
 [2]
 Although Congress used a shorthand in drafting Title II whereby the remedies are defined by cross-reference to the well-established implied right of action under Title VI, Congress explicitly provided for a private right of action and a remedial scheme. See 42 U.S.C. § 12133LQ; see also Gebser, 118 S.Ct. at 1996
 
 
 [3]
 Section 505(a)(2) contains the relevant remedy provisions for violations of § 504. 29 U.S.C. § 794a(a)(2)
 
 
 [4]
 The City could have escaped Title II liability by showing that compliance with the DOJ regulations would have required a fundamental alteration in the nature of the 911 system, or imposed an undue financial or administrative burden on the City. See 28 C.F.R. § 35.150(a)(3). The City does not contend, however, that this exception applies
 
 
 [5]
 I agree that the district court properly granted summary judgment to the Rodaboughs on the basis of qualified immunity