Melvin **KRAMER**

v.

**PORT AUTHORITY OF ALLEGHENY COUNTY, Appellant.**

Commonwealth Court of Pennsylvania.

Argued May 3, 2005.

Decided June 7, 2005.

Nicholas J. Evashavik, Pittsburgh, for appellant.

James B. Lieber, Pittsburgh, for appellee.

BEFORE: SMITH–RIBNER, Judge, and FRIEDMAN, Judge, and FLAHERTY, Senior Judge.

OPINION BY Judge FRIEDMAN.

Port Authority of Allegheny County (PAT) appeals from the August 25, 2004, order of the Court of Common Pleas of Allegheny County (trial court), which denied PAT's motions for post-trial relief following a jury trial and verdict in favor of Melvin Kramer (Plaintiff) on a claim under Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12131–12165, and section 504 of the Rehabilitation Act, 29 U.S.C. § 794. We affirm.

The ADA and the Rehabilitation Act each prohibit public entities such as PAT from excluding, denying access to or otherwise discriminating against any person because of a disability. 42 U.S.C. § 12132;

29 U.S.C. § 794. Relevant regulations adopted by the Secretary of Transportation pursuant to these statutes prohibit discrimination against an individual with a disability in connection with transportation services. 49 C.F.R. § 37.5. Pursuant to these regulations, PAT is required to maintain features that are necessary to make vehicles readily accessible to, and usable by, individuals with disabilities. PAT must promptly repair accessibility features, and, when an accessibility feature is out of order, PAT must take reasonable steps to accommodate individuals with disabilities who would otherwise use the feature to access public transit. 49 C.F.R. § 37.161. "This section does not prohibit isolated or temporary interruptions in service or access due to maintenance or repairs." *Id.*

The regulations specifically require PAT to: ensure that vehicle lifts are kept in operative condition; establish a system of regular and frequent maintenance checks; ensure that operators promptly report lift operation failures during service; and take a vehicle with an inoperative lift out of service prior to the beginning of a shift if a spare vehicle is available. If no spare bus is available, PAT may keep the vehicle with an inoperative lift in service for no more than three days. In any case in which a vehicle is operating with an inoperative lift and the headway to the next accessible vehicle (time until the next bus) on the route exceeds thirty minutes, PAT is required to promptly provide alternative transportation to individuals with disabilities who are unable to use the vehicle because its lift does not work. 49 C.F.R. § 37.163.

PAT also is required to ensure that vehicle operators and other personnel make use of accessibility-related equipment or facilities and to ensure that its personnel are trained to proficiency, so that they operate vehicles and equipment safely and properly assist and treat individuals with disabilities in a respectful and courteous way. 49 C.F.R. § 37.167(e), 49 C.F.R. § 37.173. "Training to proficiency" includes training in the proper operation and maintenance of accessibility features and equipment, boarding assistance, sensitivity and appropriate interaction with passengers with disabilities and familiarity with the requirements of applicable regulations. 49 C.F.R. § 37.209. In addition, the provisions of 49 C.F.R. § 37.207 state that it shall be considered discrimination for any operator to deny transportation to passengers with disabilities or to fail or refuse to comply with any applicable provision of Title 49 (Transportation), Part 37 (Transportation Services for Individuals with Disabilities).

Plaintiff has been confined to a wheelchair since 1998 as a result of injuries he sustained in an automobile accident. Since that time, he has depended in large part on public transportation to travel within Allegheny County, including travel to and from his workplace. Plaintiff filed suit against PAT alleging that PAT had violated the ADA and the Rehabilitation Act through a repeated pattern of failing to maintain adequate facilities and equipment to allow him access to PAT buses and streetcars.[1]

At trial, Plaintiff stated that he carries a notebook in his backpack and records details concerning inoperable wheelchair lifts and other problems and was presently

---

1. Plaintiff subsequently amended his complaint, reduced the amount of damages sought and requested a transfer of the matter to arbitration. A panel of arbitrators found PAT had intentionally violated Plaintiff's rights and awarded Plaintiff $10,000. PAT appealed the arbitration award, and the case proceeded to trial.

working on a fourth notebook. (R.R. at 101a–02a.) Plaintiff testified concerning numerous instances (approximately one hundred and sixty) in which he was unable to board a PAT bus because wheelchair lifts were inoperable. On at least nine of these occasions, equipment failed on more than one bus in succession or otherwise required Plaintiff to wait more than the allowed thirty-minute headway for the next accessible vehicle; in one instance, five buses in a row had an inoperable lift. (R.R. at 116a.) Plaintiff further testified that, on one occasion where the lift was not working, the operator refused to allow Plaintiff's roommate to help him board the bus. (R.R. at 107a–08a.) On another occasion, a driver was unable to stop close to the curb due to parked cars, causing the wheelchair ramp to extend at a steep angle, and the driver refused Plaintiff's request for assistance. (R.R. at 1090a–10a.) In another instance, a driver familiar to Plaintiff did not stop for him but merely waved, and Plaintiff assumed the wheelchair lift was broken again. (R.R. at 111a–12a.) Another time, a PAT driver refused to attempt to manually operate a wheelchair lift, stating she was not strong enough. (R.R. at 114a.). Plaintiff testified that on another occasion a lift broke at the bus stop and could not be stowed back into the bus, and Plaintiff had to sit in the pouring rain while the bus and its passengers waited for a tow. (R.R. at 117a.) Plaintiff also stated that the first time he took the "T" (PAT trolley service) after his accident, he was unable to use a downtown subway station because the elevator was inoperable. Plaintiff estimated that he had encountered broken elevators on ten occasions. (R.R. at 100a.) Plaintiff further testified that he did not use Access[2] regularly because the one time he signed

up for an 8:00 a.m. pick-up, Access came at 5:30 a.m. and it was just too inconvenient. (R.R. at 122a.)

On cross-examination, Plaintiff agreed that, in 2001, he took the bus thirty times a week, and the "T" three to four times a week, for an average of one hundred and thirty five trips per month. Plaintiff's records for 2001 noted the following number of lift malfunctions per month: April-eight; May-five; June-six; July-four; August-two; September-four; October-seven; November-one; and December-five.

Plaintiff admitted that in each of those instances the next scheduled bus had an operable lift. (R.R. at 124a–27a.) Plaintiff's records reflect that, during 2002, Plaintiff rode the bus approximately 1,530 times. On sixty-eight occasions the scheduled bus had an inoperable lift, but Plaintiff was able to take the next scheduled bus on all but four of these occasions. (R.R. at 127a–30a.) In 2003, Plaintiff took about seventy bus trips per month and encountered a broken lift on ten occasions; in each instance, Plaintiff was able to take the next scheduled bus. (R.R. at 130a.)

Plaintiff conceded that out of a total of 3,650 trips, he was unable to take the second scheduled bus on only nine occasions. (R.R. at 131a.) He also agreed that this 99.75% success rate constitutes a temporary interruption of service. (R.R. at 132a.) Plaintiff acknowledged that he was not fired from his job due to his transportation difficulties, but he stated that he had been yelled at for being late to work. (R.R. at 132a.)

Plaintiff also testified that he had called PAT on five to seven occasions to report inoperable lifts, that PAT took information

---

**2.** Plaintiff testified that Access is a public welfare transportation service for which 48 hours prior notice is required. (R.R. at 137a.)

from him and informed him that someone would call him back in seven to ten business days and that no one from PAT ever returned his calls. (R.R. at 134a–35a.) Plaintiff further stated that PAT never arranged alternate transportation for him through Access when he encountered successive buses with inoperable lifts. (R.R. at 137a.)

PAT presented the testimony of Daniel J. DeBone, Assistant Director of Road Operations, whose duties include overseeing ADA compliance issues and the education and training of operators with respect to ADA requirements. (R.R. at 7a–8a; 12a; 143a.) DeBone testified that he authored a manual for PAT concerning ADA policies and procedures. (R.R. at 144a–45a.) DeBone also stated that he meets with a group called the Committee for Access and Transportation twice monthly to learn about transportation issues that concern people with disabilities, and PAT has adopted many suggestions made by that committee. (R.R. at 145a–46a.) DeBone testified that he works with public school and adult learning centers, taking buses to the sites and allowing children and adults with disabilities to practice getting on and off the buses and become familiar with using the fare boxes. (R.R. at 148a.) DeBone stated that PAT's current fleet of buses was 100% accessible. (R.R. at 149a.)

DeBone stated that: drivers are required to assist passengers exiting the bus; traffic dispatchers are trained regarding ADA requirements and are aware that if a vehicle's lift is inoperable, an available spare must be sent in its place; and operators are trained to contact the Traffic Department regarding inoperable lifts, which initiates the process of trying to find alternate transportation within thirty minutes. (R.R. at 4a–5a; 37a; 43a.) He stated that when an operator performs a pre-trip

check and finds an inoperable lift, a spare bus may not be available, and decisions as to whether a spare is available or whether the bus should go out anyway, with an inoperable lift, are made by the Traffic Department. (R.R at 157a–60a.)

DeBone testified that, since the ADA became effective in 1990, PAT drivers receive a full day of sensitivity training with respect to ADA issues, during which drivers interact with people with various types of disabilities and then use wheelchairs themselves to experience what it is like for wheelchair passengers to wait for a bus, board, exit, and secure themselves. (R.R. at 152a–54a.) He further testified that in addition to training, PAT has twenty-two bus instructors that do nothing but ride buses, and the instructors reinforce ADA policies and procedures with drivers. (R.R. at 155a.) DeBone also testified that PAT has only five documented complaints from Plaintiff concerning broken lifts. (R.R. at 1a–2a, 40a.)

David Zemba, a PAT bus driver for more than twenty-three years, testified that he received training concerning the ADA on one occasion, approximately five years earlier. Zemba stated that he had classes on operating wheelchair lifts and also received instruction concerning the manual operation of wheelchair lifts. Zemba stated that each shift begins with a pre-trip check, according to a pre-trip inspection card. He testified that the pre-trip inspection includes a check of the vehicle's wheelchair lift, which takes about three minutes. According to Zemba, buses and lifts were operational 95% of the time over the last three to four years. (R.R. at 66a–69a; 73a; 78a.)

Zemba testified that if a vehicle's lift was inoperable, the lift would be repaired, the bus would be replaced with another vehicle or the bus would be sent into service. He said that if a lift becomes inoper-

able during the route, he calls the Traffic Department, finds out about the next accessible bus and advises any waiting wheelchair passenger. Zemba stated that if the headway exceeds thirty minutes, the Traffic Department will radio for any available bus to pick up the wheelchair passenger, and, if no bus is available, the Traffic Department will call Access and arrange for a pick-up. (R.R. 74a–75a, 79a.)

Joyce Brooks, a PAT bus driver for sixteen years, testified that she had received ADA training, including wheelchair procedures, in 1992. She also stated that if a lift breaks en route, it can be lowered manually without difficulty. (R.R. at 81a, 86a–87a.)

William Miller testified that he began working for PAT in 1993 as a maintenance foreman and is presently PAT's Director of Bus Maintenance. (R.R. at 165a, 172a.) He stated that PAT has approximately 200 buses at each of five garages and a total of about 1,030 buses on the road. (R.R. at 170a–71a, 174a.) Miller testified that most problems with wheelchair lifts are fixed at the garage; occasionally (fifteen to twenty times a year), a lift needs to be completely rebuilt and is sent to another location. (R.R. at 189a.) Miller stated that each garage has spare buses at a ratio of about twenty percent, or forty buses, at each garage. Of that twenty percent, some may be scheduled for heavy repairs, and, therefore, about ten to fifteen percent of the buses are available spare buses and ready for the road. (R.R. 197a–98a.)

Miller confirmed that bus operators check the wheelchair lifts before taking a bus from the garage. (R.R. at 196a.) He stated that if he checked a lift at a garage, found it inoperable and was unable to do an on-spot repair, he would ask the operator whether there was an ADA passenger on the route. If so, Miller stated he would immediately "shop" that bus and get the driver a spare. (R.R. at 198a–99a.) According to Miller, if the driver did not anticipate having an ADA passenger on that route, the bus would be logged and repaired by a wheelchair mechanic as soon as it returned that night. (R.R. at 200a.) Miller explained that buses undergo regular maintenance and inspections, and wheelchair lifts are inspected every forty-five days. (R.R. at 202a.) He also stated that if there is free time in the maintenance schedule, a bus with an inoperable lift will be sent for repair right away, and the driver will be given a spare. (R.R. at 202a–03a.) Miller later testified that if an operator finds a lift inoperable during pre-check, an alternative bus always will be provided to the driver if one is available, and, in his experience, a driver never was told to take out a bus with a broken lift when a spare was available. (R.R. at 224a.)

Miller testified that when he began working as Director of Bus Maintenance, he instituted bi-weekly audits at each garage location of all buses, including spare buses that were not undergoing maintenance, for wheelchair lifts, interior cleans and exterior cleans. (R.R. at 209a, 213a–14a.) Miller testified that results of the first audit showed that roughly ninety percent of the lifts were operational, and that the number has remained at about ninety to ninety-one percent. (R.R. at 217a–19a.)

At the conclusion of the trial, the jury returned a verdict in Plaintiff's favor, finding that Plaintiff's rights were intentionally violated and awarding Plaintiff $10,000 in damages. The trial court subsequently granted Plaintiff's motion for an award of attorney's fees pursuant to section 505 of the ADA and ordered PAT to pay attorney's fees in the amount of $25,307.85. The trial court thereafter denied PAT's post-trial motions for a compulsory non-

suit and judgment n.o.v or, alternatively, a new trial.

■ On appeal to this court,[3] PAT argues that the trial court committed an error of law or abuse of discretion in denying PAT's motions for a compulsory non-suit and judgment n.o.v. because Plaintiff failed to meet his burden of proving that PAT violated the ADA and that any such violation was intentional.

■ To prevail on a claim for a violation of Title II of the ADA, a plaintiff must show that: (1) he is a qualified individual with a disability; (2) he was either excluded from or otherwise denied the benefits of some public entity's services, programs or activities, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits or discrimination was by reason of the plaintiff's disability. *Douris v. Dougherty*, 192 F.Supp.2d 358 (E.D.Pa.2002). In addition, the majority of circuit courts that have addressed the issue have held that compensatory damages under Title II of the ADA are not available absent a showing of intentional discrimination.[4] *See Ferguson v. City of Phoenix*, 157 F.3d 668 (9th Cir.1998); *Wood v. President and Trustees of Spring Hill College*, 978 F.2d 1214 (11th Cir.1992); *Carter v. Orleans Parish Public Schools*, 725 F.2d 261 (5th Cir.1984).

PAT argues that, because the applicable regulations allow an entity to utilize a bus with an inoperable lift for up to three consecutive days, 49 CFR § 37.163(e), and allow for temporary or isolated interruptions in service due to mechanical failures, 49 CFR § 37.161(c), none of the roughly one hundred sixty instances where a wheelchair lift or elevator did not work for Plaintiff is a violation of the ADA as a matter of law. With respect to the nine occasions where Plaintiff was unable to board either the first or second bus within the allowed thirty-minute headway due to an inoperable lift, PAT calculates its compliance rate as 99.75%, and PAT maintains that these nine instances can only reasonably be seen as permissible isolated or temporary interruptions in service. PAT also argues that, even if the nine instances constitute violations of the ADA, Plaintiff failed to prove that the violations were intentional. To the contrary, PAT contends that all of the evidence establishes that PAT does everything possible to comply with ADA requirements concerning operation, maintenance and employee training. Finally, PAT insists that to allow the jury's verdict to stand under these facts would create an unreasonable and unattainable standard for PAT or any other transit service.

■ A motion for compulsory non-suit allows a defendant to test the sufficiency of a plaintiff's evidence and may be entered only in cases where it is clear that the plaintiff has not established a cause of action. *Burke v. Buck Hotel, Inc.*, 742 A.2d 239 (Pa.Cmwlth.1999). In making this determination, the plaintiff must be given the benefit of all evidence favorable to him, together with all reasonable inferences of fact arising therefrom, and any conflict in the evidence must be resolved in his favor. *Id.* A judgment of non-suit is properly entered if a plaintiff has not introduced sufficient evidence to establish the elements necessary to maintain an action, and it is the duty of the trial court, prior to sending the case to a jury, to

---

3. Our scope of review of a trial court's decision denying a motion for post-trial relief is limited to determining whether the trial court abused its discretion or committed an error of law. *Burke v. Buck Hotel, Inc.*, 742 A.2d 239 (Pa.Cmwlth.1999).

4. The Third Circuit has yet to address this issue.

determine whether or not the plaintiff has met this burden. *Id.*

■ Here, Plaintiff presented evidence that, on four separate occasions, a PAT operator denied Plaintiff access to a bus; in three of those instances an operator refused to provide requested assistance and in another instance the operator failed even to stop. In addition, Plaintiff presented evidence that PAT failed to provide accessible transportation on at least nine occasions when more than one bus in succession had inoperable lifts. Finally, the testimony of the two PAT bus drivers raises fact questions as to whether PAT provided adequate training. *See* 49 CFR § 37.209 (requiring entities to provide refresher training to personnel as needed to ensure proficiency). Accordingly, because Plaintiff's evidence is sufficient to establish a cause of action, the trial court did not err in denying PAT's motion for judgment of non-suit.

■■ Judgment n.o.v. may be entered when the movant is entitled to judgment as a matter of law, and/or the evidence was such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant. *Moure v. Raeuchle,* 529 Pa. 394, 604 A.2d 1003 (1992). With respect to the first basis, we reject PAT's implied invitation to establish, as matter of law, a permissible level of ADA violations.[5] With respect to the latter basis, it is well-settled that judgment n.o.v. cannot properly be granted where there is any evidence in the record from which the jury could have found a verdict for the plaintiff. *Clack v. Department of Transportation,* 710 A.2d 148 (Pa.

Cmwlth.1998). PAT asserts that *all* of the evidence is contrary to the jury's finding; however, as previously stated, the record includes evidence to support the jury's verdict. Thus, even though the record also may support a contrary verdict, the trial court properly denied PAT's motion for judgment n.o.v.

Judge SMITH–RIBNER concurs in the result only.

### ORDER

AND NOW, this 7th day of June, 2005, the order of the Court of Common Pleas of Allegheny County, dated August 25, 2004, is hereby affirmed.

---

**5.** We note that, in asserting its "99.75% compliance rate" argument, PAT ignores the violations of its operators, which the jury reasonably may have determined were either overtly intentional or reflected the inadequacy of PAT's training. We also note that the record includes no explanation for PAT's failure to provide alternate transportation to Plaintiff in the nine instances cited, nor any indication that these failures resulted from breakdowns of normal procedures.