260 F.3d 1124 (9th Cir. 2001)
 CHRISTOPHER T. DUVALL, PLAINTIFF-APPELLANT,
v.
COUNTY OF KITSAP, A MUNICIPAL CORPORATION OF THE STATE OF WASHINGTON; LEONARD KRUSE, SUPERIOR COURT JUDGE; BARBARA RAZEY, KITSAP COUNTY RISK MANAGER AND ADA COORDINATOR; PATRICIA RICHARDSON, DEPUTY PROSECUTING ATTORNEY & CHAIRPERSON OF THE KITSAP COUNTY ADA COMMITTEE; MADELYN
BOTTA, KITSAP COUNTY COURT ADMINISTRATOR; WIN GRANLUND, CHAIRMAN OF THE BOARD OF COMMISSIONERS; MATT RYAN, KITSAP COUNTY COMMISSIONER; PHIL BEST, KITSAP COUNTY COMMISSIONER, DEFENDANTS-APPELLEES.
 No. 99-35934
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted March 15, 2001--San Francisco, California
August 14, 2001
Corrected October 11, 2001
 
 [Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted]
 Counsel Lonnie Davis, Disabilities Law Project, Seattle, Washington and Christopher K. Steuart, Seattle, Washington, for the plaintiff-appellant.
 Russell D. Hauge, Kitsap County Prosecuting Attorney and Jacquelyn M. Aufderheide, Deputy Prosecuting Attorney, Port Orchard, Washington, for the defendants-appellees.
 Appeal from the United States District Court Western District of Washington J. Kelley Arnold, Magistrate, Presiding D.C. No. CV-98-05448-JKA
 Before: Stephen Reinhardt, Pamela Ann Rymer, and Raymond C. Fisher, Circuit Judges.
 
 
 1
 Opinion by Judge Reinhardt; Dissent by Judge Rymer
 
 
 2
 Christopher Duvall brought this action against a superior court judge, Kitsap County, the County's Americans with Disabilities Act ("ADA") coordinator, the chairperson of the County's ADA committee, and the person who served as court administrator and court ADA coordinator. Duvall alleged that these defendants failed to accommodate his hearing impairment during the state court proceedings involving the dissolution of his marriage. Specifically, he contends that the defendants violated the ADA, Section 504 of the Rehabilitation Act, and the Washington Law against Discrimination (WLAD) by refusing to provide real-time transcription for his hearings.[1] The district court granted summary judgment to all defendants as to all claims. Duvall appeals.
 
 I. Background
 
 3
 Christopher Duvall is completely deaf in his left ear and has a severe hearing impairment in his right ear. Because he does not sign well enough to use American Sign Language or Signed English, Duvall's primary mode of receiving communication is through the written word. He wears custom-fitted hearing aids and is able to communicate effectively in one-on-one conversation in spoken English with the aid of visual cues and lip reading. He finds it extremely difficult, however, to follow a conversation in which he is not a participant. In such circumstance, he is unable to focus on a single speaker to study his facial expressions, body language, and lip movement; nor is he able to control the pace of the conversation, nor provide for a pause that would give him time to process the various aural and visual cues and interpret the speaker's message. Attempting to overhear or follow a conversation between others requires a great deal of concentration, and after approximately thirty minutes Duvall begins to suffer from tinnitus and headaches that further diminish his capacity to understand spoken communication.
 
 
 4
 In 1994 and 1995 Duvall was a party to a family law case in the superior court of Kitsap County, Washington involving the dissolution of his marriage. In his declaration, he states that he was initially able to participate meaningfully in several pre-trial hearings because the hearings were short, there was no oral testimony, and the discussion centered on written materials that he had reviewed prior to the hearing. Thereafter, however, he experienced difficulty in following the one pre-trial hearing that included extensive oral testimony. That hearing took place in courtroom 269, the courtroom designated for hearing-impaired individuals because of its small size, superior acoustics, and special equipment, including an assistive-listening device, for hearing-impaired individuals. Nevertheless, Duvall could not understand the testimony of his ex-wife, even though he knows her speech patterns very well. Subsequently, after he continued to experience difficulty understanding the proceedings in two further pre-trial hearings, Duvall realized that he would not be able to participate meaningfully when the case came to trial without some form of accommodation. He then contacted the U.S. Department of Justice and was advised that he should request videotext display from the ADA Coordinator for Kitsap County.
 
 
 5
 The parties dispute when Duvall first requested videotext display for his court proceedings. Duvall contends that he contacted Barbara Razey, the county's ADA coordinator, in April, 1995, and spoke to her several times in the six weeks preceding his trial about his need for accommodation. According to Duvall, he explained to Razey that he had examined the equipment in courtroom 269 and had concluded that it would not effectively accommodate his hearing impairment, and specifically requested real-time transcription for his trial, which was scheduled to begin in late June. He asserts that when he called Razey shortly before the trial to emphasize the importance of his request he was instructed to contact Patricia Richardson, the Chairperson of the Kitsap County ADA Committee, because Razey was on vacation. According to Duvall, Richardson took no action with regard to his request but, instead, directed him to contact Madelyn Botta, who was both the Director of the Superior Court Administrative Services and the ADA coordinator for the superior court.[2]
 
 
 6
 Duvall asserts that he telephoned Botta twice in mid-May. While the substance of their conversations is disputed, Duvall contends that he requested real-time transcription. Subsequently, Botta contacted Duvall's attorney, Michael Alvarado, and told him that the trial would be held in a courtroom equipped for the hearing impaired, that neither she nor the judge would speak directly to Duvall, and that Duvall could file a motion with the court regarding accommodation if he wished.[3] None of the court or county officials attempted to determine whether the facilities in courtroom 269 would accommodate Duvall's hearing impairment, or whether it would be possible to provide videotext display through a court-reporting service, although, according to Duvall, he had informed them that the accommodations provided in Courtroom 269 were inadequate, given the nature of his particular hearing problems.
 
 
 7
 The trial for the marriage dissolution action was held before Judge Leonard Kruse on June 21, 22, and 23 in courtroom 269. That courtroom was equipped with the "Telex Soundmate," an assistive audio system for hearing-impaired individuals. Duvall contends that this device was inappropriate for an individual like himself who uses hearing aids that are precisely adjusted to the user's hearing needs. Telex-Soundmate did not contain an inductive loop system that would transmit to Duvall's hearing aids and make use of their customized settings. He further declares that the facilities in courtroom 269 required him to remove his hearing aids and to use earbuds, which provided only general amplification and impeded the use of his natural hearing ability. By Duvall's account, requiring him to remove his hearing aids to use the inferior Soundmate system was equivalent to requiring a person with an artificial leg to remove the leg and use crutches.
 
 
 8
 Duvall's attorney made a motion to the court on the first day of trial requesting videotext display to accommodate Duvall's hearing impairment. Judge Kruse stated in his deposition that this was the first time that he had heard about Duvall's request for that accommodation. In any event, Judge Kruse denied the motion, stating,
 
 
 9
 [T]hat's the way humans happen to communicate, I guess up until a very recent time, with one another is orally. And I know that some courts in some places have the ability to have, in effect, an on-line screen available through the court reporter. We have not progressed to that technical degree in this county, and I can only assume that if Mr. Duvall wished to have that service available he can provide that service for himself.
 
 
 10
 Judge Kruse did, however, permit Duvall to move around the courtroom freely and position himself wherever he could best hear the proceedings. Duvall sat in the jury box for a portion of the trial. Although this permitted him to understand the witnesses somewhat better, he was unable to communicate easily with his lawyer, who was sitting at the counsel table. He testified that he made extensive notes to preserve his thoughts for his lawyer, but that he missed the testimony that occurred while he was looking down to write notes. When Duvall's ex-wife took the stand on the first day of trial, Judge Kruse stated that the parties and attorneys could move about the courtroom "unless it . . . starts to be disconcerting in some regard or intimidating or something." Duvall states in his declaration that he interpreted this remark to imply that he was sitting too close to the witnesses, and moved several seats away from the witness box, putting him out of effective aural range of the witnesses and attorneys. According to Duvall, at this point he "gave up" and returned to his seat next to his attorney for the remainder of the trial. The intense concentration required to attempt to follow the proceedings resulted in exhaustion, headaches, and tinnitus, further impeding his ability to hear. In sum, Duvall avers that his hearing impairment prevented him from meaningfully participating in the trial.
 
 
 11
 A post-trial hearing was scheduled for August 11, 1995. According to Duvall, he phoned Razey and Richardson about ten days before the hearing to again request videotext display. On August 8 Duvall hand-delivered a letter to both Razey and Botta requesting that videotext display be provided at the upcoming hearing. Razey testified that as the ADA Coordinator for the County she had the authority to arrange accommodations for Duvall. When she received Duvall's letter, she discussed it with Botta and Richardson, and Richardson responded to Duvall on behalf of the County on the same day with a letter stating simply that the hearing would be held in Courtroom 269. Again, no county or court official made any effort to determine whether videotext transcription was available. Duvall brought a motion for a mistrial at the August 11 hearing, based upon the court's failure to provide videotext display at the trial, and Judge Kruse denied the motion, stating that real-time transcription was not available in Kitsap County.
 
 
 12
 At the time of Duvall's June trial, one of the county's court reporters was training to learn real-time transcription, and in fact had already demonstrated to Botta and several of the superior court judges how that process works. Duvall also submitted declarations of court reporters in Seattle who stated that they could have provided videotext display at the time of his trial. Indeed, when Razey first contacted firms in Seattle and Tacoma in September 1995 as part of the investigation of Duvall's complaint to the county ADA grievance committee, she learned that these firms did, in fact, have the capacity to provide videotext display to the superior court in Kitsap County. Moreover, although Sandra Baker and Associates, an independent firm that provided much of Kitsap County's court-reporting services, had never provided videotext display prior to September 1995, when Kitsap County first requested this service on September 19, 1995, that firm also was able to accommodate the request. It provided videotext display for Duvall's post-trial court hearing three days later, and for the subsequent hearings.
 
 
 13
 The County's ADA grievance committee denied Duvall's grievance on October 6, and the Board of County Commissioners denied his appeal in late November. Duvall filed suit in federal district court under Title II of the ADA, Section 504 of the Rehabilitation Act of 1973, the Washington Law Against Discrimination (WLAD), and 42 U.S.C. §§ 1983 seeking declaratory[4] and compensatory relief. The suit named as defendants (1) Judge Kruse and court administrator and ADA coordinator Botta (collectively "the Superior Court defendants") and (2) County ADA Coordinator Razey, County ADA committee chairperson Richardson, and the three members of the Board of County Commissioners (collectively "the County defendants").[5] The district court granted summary judgment to all defendants on all claims. Duvall now appeals.
 
 II. Judicial Immunity
 
 14
 The district court granted summary judgment to Judge Kruse and court administrator Botta on the ground of judicial immunity. It is well settled that judges are generally immune from suit for money damages. Mireles v. Waco, 502 U.S. 9, 9-10 (1991). However, absolute judicial immunity does not apply to non-judicial acts, i.e. the administrative, legislative, and executive functions that judges may on occasion be assigned to perform. Forrester v. White, 484 U.S. 219, 227 (1988). We have identified the following factors as relevant to the determination of whether a particular act is judicial in nature:
 
 
 15
 (1) the precise act is a normal judicial function; (2) the events occurred in the judge's chambers; (3) the controversy centered around a case then pending before the judge; and (4) the events at issue arose directly and immediately out of a confrontation with the judge in his or her official capacity.
 
 
 16
 Meek v. County of Riverside, 183 F.3d 962, 967 (9th Cir. 1999).
 
 
 17
 We conclude that Judge Kruse was acting in a judicial capacity when he refused to accommodate Duvall. Judge Kruse testified that he first learned of Duvall's request for videotext display on the first day of trial, when Duvall's attorney brought a motion requesting videotext display. Following completion of the trial, Duvall requested a new trial because of the absence of videotext display during that proceeding. Duvall's motions were made by his attorney while Judge Kruse was presiding over Duvall's case. The judge stated that, when he ruled on the motion requesting videotext display, he did not consider Duvall's request under the ADA. Instead, Judge Kruse considered only whether, as a matter of courtroom administration, the courthouse was able to provide videotext display without delaying the start of the trial. At the August post-trial hearing, Judge Kruse simply ruled that Duvall was not entitled to a new trial based upon the court's earlier refusal to provide videotext display. Ruling on a motion is a normal judicial function, as is exercising control over the courtroom while court is in session. Judge Kruse is therefore entitled to absolute judicial immunity.[6]
 
 
 18
 Judicial immunity is extended to"certain others who perform functions closely associated with the judicial process." Moore v. Brewster, 96 F.3d 1240, 1244 (9th Cir. 1996). "When judicial immunity is extended to officials other than judges, it is because their judgments are `functional[ly] comparab[le]' to those of judges -that is, because they, too, `exercise discretionary judgment' as part of their function." Antoine v. Byers & Anderson, Inc., 508 U.S. 429, 436 (1993) (citation omitted); see also Greater Los Angeles Council on Deafness v. Zolin, 812 F.2d 1103, 1108 (9th Cir. 1987) (holding that "the lynchpin of both the judicial and quasi-judicial immunities" is that the acts in question are"an integral part of the judicial process"). Here, Botta was the superior court ADA coordinator as well as the court administrator. She concedes that she had ministerial authority to arrange courtroom accommodations for disabled individuals, but contends that, because she was entitled to determine whether Duvall would receive his requested accommodations only in consultation with the judge presiding over his case, she is entitled to quasi-judicial immunity.
 
 
 19
 For Botta's defense of absolute immunity to succeed, she must demonstrate that her decision to refuse videotext display was functionally comparable to the type of decision made by a judge. See Antoine, 508 U.S. at 436. Absolute immunity is "the exceptional case." Zolin , 812 F.2d at 1108. Although, in her deposition, Botta expressed uncertainty about the limits of her authority to provide accommodations, she admitted that, as the court's ADA coordinator, she was the appropriate person from whom to request accommodations. She further acknowledged that she made the decision to accommodate Duvall by scheduling his trial in Courtroom 269, rather than by providing him with videotext display. That she may have decided upon the accommodation she provided after consulting with Judge Kruse does not demonstrate that she was exercising a quasi-judicial function rather than implementing the requirements of the ADA pursuant to duties that had been assigned to her -particularly in light of Judge Kruse's testimony that Botta did not consult with him or inform him about Duvall's request for videotext display. In fact, some of Botta's deposition testimony strongly suggests that her decision not to provide videotext display was administrative in nature.
 
 
 20
 Q: You said that if someone came to you and requested an ASL interpreter for litigation, you would make that decision yourself.
 
 
 21
 A: Right, based on the statute.
 
 
 22
 Q: Which statute?
 
 
 23
 A: I can't cite it to you, but it's my understanding that the legislature has decided that sign-language people should be available and that there is a statute -I can't cite it to you.
 
 
 24
 Q: Do you know if that statute speaks to any disabilities other than the need for a sign-language interpreter?
 
 
 25
 A: I don't know.
 
 
 26
 Q: So based on that statute you had the authority to provide . . . [a] sign-language interpreter?
 
 
 27
 A: Right.
 
 
 28
 Thus, it appears that when a statute requires, or perhaps even authorizes, the provision of a particular form of assistive device to a hearing-impaired individual, Botta has the authority to make the necessary arrangements therefor, as an administrative matter. Further, it appears that in acknowledging her authority in that regard, that Botta may have been adverting to the very statutes at issue here.[7] Accordingly, the type of decision-making authority Botta exercised in Duvall's case appears, at the very least, to raise an issue of material fact as to whether she was acting in an administrative rather than quasi-judicial capacity. Because the burden is on the official claiming immunity to demonstrate that public policy requires recognition of an absolute immunity, see Zolin , 812 F.2d at 1108, we hold that Botta's deposition testimony alone precludes summary judgment in her favor.
 
 III. Reasonable Accommodation
 
 29
 Duvall's complaint also alleges that the County defendants denied him the use of videotext display at his trial on June 21, 22, and 23, and at his post-trial hearing on August 11 in violation of the ADA, the Rehabilitation Act, and the WLAD. Title II of the ADA provides:
 
 
 30
 . . . [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.
 
 
 31
 42 U.S.C. §§ 12132. To prove that a public program or service violated Title II of the ADA, a plaintiff must show: (1) he is a "qualified individual with a disability"; (2) he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability. Weinreich v. Los Angeles County Metropolitan Transp. Auth., 114 F.3d 976, 978 (9th Cir. 1997).
 
 
 32
 Title II of the ADA was expressly modeled after §§ 504 of the Rehabilitation Act.[8] A plaintiff bringing suit under §§ 504 must show (1) he is an individual with a disability; (2) he is otherwise qualified to receive the benefit; (3) he was denied the benefits of the program solely by reason of his disability; and (4) the program receives federal financial assistance. Id. Similarly, the elements of a prima facie claim of discrimination in a place of public accommodation under the WLAD[9] are: (1) the plaintiff is disabled; (2) defendant's establishment is a place of public accommodation; (3) disabled persons are not provided services comparable to those provided nondisabled persons by or at the place of public accommodation; and (4) the disability was a substantial factor causing the discrimination. Fell v. Spokane Transit Auth., 128 Wn. 2d 618, 637 (Wash. 1996) (en banc). Because the elements of Duvall's ADA, Rehabilitation Act, and WLAD claims do not differ in any respect relevant to the resolution of this appeal,[10] we address these claims together. See Zulkle v. Regents of the University of California, 166 F.3d 1041, 1045 n.11 (9th Cir. 1999).
 
 
 33
 As a severely hearing-impaired individual who was a party to a lawsuit involving public hearings, Duvall is a qualified individual with a disability for purposes of the ADA. 42 U.S.C. §§ 12131. The primary issue in dispute is whether the County was required to provide videotext display as a reasonable accommodation for Duvall's disability. The regulations implementing Title II of the ADA provide:
 
 
 34
 A public entity shall furnish appropriate auxiliary aids and services where necessary to afford an individual with a disability an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity conducted by a public entity.
 
 
 35
 28 C.F.R. §§ 35.160(b)(1). The regulations specifically mention "transcription services . . . videotext displays, or other effective methods of making aurally delivered materials available to individuals with hearing impairments" as auxiliary aids and services that may be required by the ADA, 28 C.F.R. §§ 35.104(1). The 1991 preamble to the regulation notes that videotext display is "often used at conferences, conventions and hearings," 28 C.F.R. §§ 35.104 App.A, and may be "an effective auxiliary aid or service for a person who is deaf or has a hearing loss who uses speech to communicate. " 28 C.F.R. §§ 35.160 App.A.
 
 
 36
 The defendants argue first that videotext display was not a reasonable accommodation because it was not available in Kitsap County at the time of Duvall's trial. Duvall has presented sufficient evidence to create a triable issue of fact as to whether real-time transcription was a reasonable accommodation in Kitsap County in June 1995. He has presented deposition testimony from Botta that, sometime before June, she attended a demonstration by one of the county's court reporters of the use of videotext display, and Judge Kruse's testimony establishing that the judge was familiar with both the demonstration and the court reporter. Duvall provided declarations of other court reporters who could have provided videotext display for the Kitsap County court at the time of his trial. When the County first requested videotext display services from a local firm in September, the firm was able to provide this service for Duvall's hearing three days later. When Razey investigated the availability of real-time transcription in September, she discovered that firms in both Seattle and Tacoma could provide the service for the court. Although the County defendants were not aware of a court reporting service that provided real-time transcription when Duvall allegedly made his request, the ADA imposes an obligation to investigate whether a requested accommodation is reasonable. We have observed that "mere speculation that a suggested accommodation is not feasible falls short of the reasonable accommodation requirement; the Acts create a duty to gather sufficient information from the disabled individual and qualified experts as needed to determine what accommodations are necessary . . . ." Wong v. Regents of the University of California, 192 F.3d 807, 818 (9th Cir. 1999). In determining what type of auxiliary aid is necessary, a public entity must "give primary consideration" to the accommodation requested by the disabled individual. 28 C.F.R. §§ 35.160(b)(2). The evidence in the record strongly suggests that the County would have been able to provide videotext display for Duvall's hearings if the defendants had given due consideration to Duvall's requested accommodation and investigated the availability of real-time transcription.
 
 
 37
 Noting that a public entity need only provide auxiliary aids and services "where necessary to afford an individual with a disability an equal opportunity to participate" in a public service or program, 28 C.F.R. §§ 35(b)(2) (emphasis added), defendants next argue that the accommodations offered to Duvall were sufficient to reasonably accommodate his disability. To prevail under the ADA, Duvall must show that the accommodations offered by the County were not reasonable, and that he was unable to participate equally in the proceedings at issue. Memmer v. Marin County Courts, 169 F.3d 630, 633-34 (9th Cir. 1999). The County argues that it offered two effective accommodations for Duvall's hearing impairment: (1) the Soundmate assistive listening device, which Duvall refused, and (2) assignment to the courtroom designed for hearing-impaired persons, along with permission to sit wherever he could best see and hear the witnesses.
 
 
 38
 Duvall presented evidence that he examined the Telex Soundmate system prior to his trial, determined that it was inappropriate for his needs, and explained to Razey that the device was incompatible with his particular disability. Duvall testified that the Soundmate system would require him to remove his hearing aids, which are precisely adjusted to his hearing needs, and replace them with the system's earbuds, which would provide only general amplification and would impede his natural hearing ability.
 
 
 39
 Duvall also offered evidence that, despite the superior acoustics of courtroom 269 and his ability to move freely about the courtroom, he was unable to participate equally in his trial and his post-trial hearing. He testified that although sitting in the jury box made it somewhat easier to understand the witnesses, he missed testimony while he was taking extensive notes to preserve his thoughts for his lawyer, who was sitting at the counsel table. Duvall stated that at some point he "gave up" on sitting in the jury box and returned to his seat next to his attorney for the remainder of the trial. According to Duvall, the intense concentration required to attempt to follow the lengthy proceedings through a combination of lip reading, aural hearing, and interpretation of body language resulted in headaches, exhaustion, and tinnitus, making it even more difficult for him to hear. The defendants rely on Judge Kruse's conclusion that Duvall was able to participate equally based on his observations that he was able to respond appropriately to questions and to consult with his attorney at the hearings. However, Judge Kruse's observations are not inconsistent with Duvall's testimony that although he is able to communicate effectively in one-on-one conversation with the aid of visual cues and lipreading, he has much more difficulty following a conversation in which he is not a participant because he is unable to focus on a single speaker or to control the pace of the conversation.
 
 
 40
 The defendants rely heavily on our decision in Memmer to support their position. In Memmer, we found that a court did not fail to accommodate a litigant's visual impairment when it offered a Spanish interpreter who did not have specific training in aiding blind persons rather than the litigant's requested reader. We first held that no accommodations were necessary at the pre-trial stage because those hearings did not involve examining exhibits or reading documents, and Memmer was therefore not disadvantaged in any way by the denial of the reader. Noting that the requested service of assisting in examining exhibits and reading documents during the trial did not require special skill, we also held that Memmer failed to carry her burden of proof under the ADA because she did not consult with the Spanish interpreter offered by the court to determine whether he could assist her, and presented no evidence that he was "a less able or sufficient reader" than her preferred reader. 169 F.3d. at 634. Here, by contrast, Duvall examined the court's proposed accommodation -the assistive listening system -prior to rejecting it, and presented evidence regarding the insufficiency of this device. Further, he offered detailed testimony explaining the difficulties he experienced following the proceedings in his case. Duvall has thus presented sufficient evidence to create a material issue of fact as to whether the refusal to provide videotext display prevented him from participating equally in the hearings at issue.
 
 IV. Intentional Discrimination
 
 41
 To recover monetary damages under Title II of the ADA or the Rehabilitation Act,[11] a plaintiff must prove intentional discrimination on the part of the defendant. Ferguson v. City of Phoenix, 157 F.3d 668, 674 (9th Cir. 1998).[12] This Circuit has, on three occasions, refused the opportunity to determine the appropriate test for intentional discrimination under the ADA. See id. at 675; Memmer , 169 F.3d at 633; Midgett v. Tri-County Metro. Transp. Dist. of Oregon , 2001 WL 709214 (9th Cir. 2001). Instead, we decided each time to set forth the options, rather than to resolve the issue, leaving subsequent courts to choose between a "deliberate indifference" or "discriminatory animus" standard. See Ferguson, 157 F.3d at 675 (setting forth, without deciding, the available options); Memmer, 169 F.3d at 633 (noting that Ferguson had delimited the range of permissible options). We now determine that the deliberate indifference standard applies.
 
 
 42
 In so doing, we follow the example of the circuits that have considered the intentional discrimination requirement following our decision in Ferguson. See Bartlett v. New York State Board of Law Examiners, 156 F.3d 321, 331 (2d Cir. 1998) reversed on other grounds, 527 U.S. 1031 (1999) (citing Ferguson and adopting the deliberate indifference standard); Powers v. MJB Acquisition Corp., 184 F.3d 1147, 1153 (10th Cir. 1999) (discussing Ferguson and applying deliberate indifference standard to Rehabilitation Act).[13] Moreover, the deliberate indifference standard adopted by those circuits is better suited to the remedial goals of Title II of the ADA than is the discriminatory animus alternative noted in Ferguson. Deliberate indifference requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that the likelihood. City of Canton v. Harris, 489 U.S. 378, 389 (1988); see also id. at 395 (O'Connor, J., concurring) (deliberate indifference requires both"some form of notice . . . and the opportunity to conform to[statutory] dictates"). In Memmer, we required the plaintiff to identify "specific reasonable" and "necessary" accommodations that the defendant failed to provide. 169 F.3d at 633. When the plaintiff has alerted the public entity to his need for accommodation (or where the need for accommodation is obvious, or required by statute or regulation), the public entity is on notice that an accommodation is required, and the plaintiff has satisfied the first element of the deliberate indifference test.
 
 
 43
 A public entity's duty on receiving a request for accommodation is well settled by our case law and by the applicable regulations. It is required to undertake a fact-specific investigation to determine what constitutes a reasonable accommodation, and we have provided the criteria by which to evaluate whether that investigation is adequate. "[M]ere[ ] speculat[ion] that a suggested accommodation is not feasible falls short of the reasonable accommodation requirement; the Acts create a duty to gather sufficient information from the [disabled individual] and qualified experts as needed to determine what accommodations are necessary." Wong, 192 F.3d at 818 (all but first alteration in original; citation and internal quotation marks omitted). Furthermore, the Attorney General's regulations require the public entity to "give primary consideration to the requests of the individual with disabilities" when determining what type of auxiliary aid and service is necessary. 28 C.F.R. §§ 35.160(b)(2). Accordingly, a public entity does not "act" by proffering just any accommodation:[14] it must consider the particular individual's need when conducting its investigation into what accommodations are reasonable. Because in some instances events may be attributable to bureaucratic slippage that constitutes negligence rather than deliberate action or inaction, we have stated that deliberate indifference does not occur where a duty to act may simply have been overlooked, or a complaint may reasonably have been deemed to result from events taking their normal course. See Ferguson, 157 F.3d at 675. Rather, in order to meet the second element of the deliberate indifference test, a failure to act must be a result of conduct that is more than negligent, and involves an element of deliberateness. See Bartlett, 156 F.3d at 331; Matthews v. Jefferson, 29 F. Supp. 2d 525, 535-536 (W.D. Ark. 1998) (notice combined with failure to provide appropriate facilities may violate Title II).
 
 
 44
 Here, Duvall provided sufficient evidence to create a triable issue as to whether Botta, one of whose jobs was that of superior court ADA coordinator, and Razey and Richardson, two of the County defendants, had notice of his need for the accommodation involved and that they failed despite repeated requests to take the necessary action. Viewing the facts in the light most favorable to Duvall, Duvall telephoned Botta to request videotext display, she failed to investigate whether such display was available (despite already having witnessed a demonstration of that system in the courthouse), and she deliberately made the decision, instead, to"accommodate" his disability by rescheduling the trial in Courtroom 269. Duvall also informed Razey, the County ADA coordinator, several weeks before his trial, and again approximately ten days before his post-trial hearing, that the existing accommodations were inadequate with respect to his disability and specifically requested videotext display for the upcoming hearings. By her own admission, Razey had the authority to arrange an accommodation for Duvall,[15] but made no effort to contact court reporting firms and determine whether they could provide videotext display until after Duvall filed a grievance following his trial. Razey made a deliberate decision to deny Duvall's requests for a particular auxiliary aid without making any effort to determine whether it would have been possible to provide the requested accommodation. Similarly, in response to Duvall's request for real-time transcription at his post-trial hearing, Richardson merely informed Duvall that his hearing would be held in the courtroom designated for hearing-impaired individuals, although Duvall had advised her over six weeks before that he was familiar with the audio system used in Courtroom 269 and that it was inadequate. Nonetheless, Richardson denied his request without investigating whether the facilities in the courtroom would accommodate Duvall's needs. If Duvall's account of the timing and content of his requests for accommodation and defendants' reactions thereto are accurate, a trier of fact could conclude that defendants' decisions not to accommodate him were considered and deliberate. Accordingly, viewing the record as we must on summary judgment, Duvall has presented sufficient evidence to show deliberate indifference, and thus intentional discrimination, on the part of Botta, Razey and Richardson.[16]
 
 
 45
 Duvall sues the County directly under the ADA and the Rehabilitation Act, and also indirectly, under 42 U.S.C. §§ 1983. When a plaintiff brings a direct suit under either the Rehabilitation Act or Title II of the ADA against a municipality (including a county), the public entity is liable for the vicarious acts of its employees. We have held that, under §§ 504 of the Rehabilitation Act (upon which the ADA was explicitly modeled), we apply the doctrine of respondeat superior to claims brought directly under the statute, in part because the historical justification for exempting municipalities from respondeat superior liability does not apply to the Rehabilitation Act, and in part because the doctrine"would be entirely consistent with the policy of that statute, which is to eliminate discrimination against the handicapped. " Bonner, 857 F.2d at 566-567. These same considerations apply to Title II of the ADA. See Zukle, 166 F.3d at 1045 n.11 (holding that, under 42 U.S.C. 12133, the "remedies, procedures, and rights" available under Title II of the ADA are equivalent to those available under §§ 504). The County is therefore vicariously liable for the actions of the two County employees, Razey and Richardson.
 
 
 46
 Duvall also brought suit under§§ 1983 for violation of his statutory rights under the ADA and the Rehabilitation Act. On appeal, the only issue pertinent to this provision raised by any of the defendants is whether Duvall has shown that the denial of his request for videotext display resulted from a custom or policy of the County. Under Monell v. Department of Social Services, 436 U.S. 658 (1978), a municipality sued under §§ 1983 is not subject to vicarious liability for the acts of its agents: it is only liable when the "execution of a government's policy or custom . . . made by . . . those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." Id. at 694; see also Board of County Comm'rs v. Brown, 520 U.S. 397, 403 (1997) ("A municipality may not be held liable under §§ 1983 solely because it employs a tortfeasor. . . . We have consistently refused to hold municipalities liable under a theory of respondeat superior."). However, even under the more stringent Monell standard, Duvall is entitled to survive summary judgment. He has, for present purposes, established that he was denied his requested accommodation based upon decisions of the County's policymakers. In a 1992 resolution, the Board of County Commissioners granted the county ADA coordinator the authority to "review, investigate, and otherwise dispose of . . . complaints [involving ADA compliance] in a manner that meets the good of the service," and Razey testified that as the ADA coordinator for the County she had the authority to make the requisite accommodations for Duvall. Razey conferred with Richardson regarding Duvall's request for accommodations and approved Richardson's letter rejecting the use of videotext display at Duvall's post-trial hearing. In any case, it is clear from the record that prior to September 1995 it was the County's custom and practice not to accommodate hearing-impaired individuals with videotext display at public hearings; indeed, the County argues that this service was not provided in Kitsap County at the time of Duvall's trial because it was not available. Accordingly, we reverse the grant of summary judgment on the §§ 1983 claims against the County, as well as Botta, Razey, and Richardson.
 
 
 47
 The Board of Commissioners, by contrast, did not become aware of Duvall's request for accommodation until after the County had arranged to provide videotext display at his future court hearings. In denying Duvall's grievance, the Board relied on the ADA grievance committee's factual findings that Duvall had not requested videotext display until the first day of his trial, and that Duvall was able to participate equally in the court proceedings without videotext display. There is no evidence of deliberate indifference on the part of the members of the Board of County Commissioners.
 
 
 48
 In sum, genuine issues of material fact exist as to whether Botta, Razey, Richardson, and the County intentionally discriminated against Duvall in violation of the ADA and the Rehabilitation Act, and also violated the anti-discrimination provisions of the WLAD, but the district court properly granted summary judgment to the three members of the Board of County Commissioners.
 
 V. Conclusion
 
 49
 The district court's grant of summary judgment in favor of Judge Kruse and the members of the Board of County Commissioners is hereby AFFIRMED. The order of summary judgment in favor of Botta, the County of Kitsap, Razey, and Richardson is REVERSED as to all claims. The case is REMANDED to the district court for proceedings consistent with this opinion.
 
 
 50
 AFFIRMED in part, REVERSED in part, and REMANDED.
 
 
 
 Notes:
 
 
 [1]
 Real-time transcription, also known as videotext display or close captioning, is a computer-aided transcription device that converts typing from the court reporter's stenographic machine into English language text displayed on a computer screen.
 
 
 [2]
 Razey and Richardson deny that Duvall requested videotext display for his trial and allege that they did not discuss any accommodation with Duvall until after the completion of his trial. Because this is an appeal from an order granting summary judgment in favor of appellees, we are required, for purposes of our review, to accept the appellant's version of all disputed facts. See Margolis v. Ryan, 140 F.3d 850, 852 (9th Cir. 1998).
 
 
 [3]
 In her deposition, Botta testified that if an individual wished to request an accommodation for a disability in the superior court, "they would be informed by the receptionist" that they should address their inquiries to Botta: "If someone walked in and said, `I have a problem . . . ' whatever it is, that type of inquiry would be sent to me."
 
 
 [4]
 In his complaint, Duvall requested a declaration "that defendants have unlawfully discriminated against Plaintiff by refusing to provide real time captioning for his dissolution of marriage proceedings." Because Duvall ultimately received real time transcription and the county now provides that service for hearing-impaired individuals, his claims for declaratory relief are now moot. See Williams v. Alioto, 549 F.2d 136, 143-44 (9th Cir. 1977). His suit for damages, however, is not. Memmer v. Marin County Courts, 169 F.3d 630, 632 n.3 (9th Cir. 1999). We therefore discuss only the claims for damages.
 
 
 [5]
 All of the individually named defendants were sued in their official capacities.
 
 
 [6]
 The defendants contend that Judge Kruse is immune from suit as a state officer under Board of Trustees of the University of Alabama v. Garrett, 121 S.Ct. 955 (2001). They do not argue that the Eleventh Amendment bars suit against any of the other defendants. Because we hold that Judge Kruse is entitled to absolute judicial immunity, we do not address whether Garrett applies to Title II of the ADA.
 
 
 [7]
 Although neither the Rehabilitation Act nor Title II of the ADA, on its face, requires the provision of sign-language interpreters as an accommodation for hearing-impaired individuals, the regulations promulgated by the Attorney General under Title II list sign-language interpreters and videotext display as among the accommodations required, in appropriate circumstances, by the ADA. 28 C.F.R §§ 35.104(1).
 
 
 [8]
 Section 504 of the Rehabilitation Act provides: No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. 29 U.S.C. §§ 794.
 
 
 [9]
 The WLAD protects "the right to the full enjoyment of any of the accommodations, advantages, facilities, or privileges of any place of public resort, accommodation, assemblage, or amusement, " Wash. Rev. Code §§ 49.60.030(1)(b), and provides that it is an unfair practice to discriminate in a place of public accommodation. RCW 49.60.215.
 
 
 [10]
 The WLAD differs from Title II of the ADA and §§ 504 of the Rehabilitation Act in that it does not require a showing of intentional discrimination in suits for money damages. See Wash. Rev. Code §§ 49.60.030(2) ("Any person deeming himself or herself injured by any act in violation of this chapter shall have a civil action in a court of competent jurisdiction to enjoin further violations, or to recover the actual damages sustained by the person, or both."); Negron v. Snoqualmie Valley Hosp., 86 Wash. App. 579, 588-89 (Wash. Ct. App. 1997) (holding that plaintiff need not show intentional discrimination to recover money damages for discrimination in a place of public accommodation under the WLAD). Because we find that Duvall has made a sufficient showing of intentional discrimination to survive summary judgment on his ADA and Rehabilitation Act claims, a fortiori he has made a sufficient showing of discrimination under the WLAD as well. In their motion for summary judgment, the defendants argue that Duvall's WLAD claim must be dismissed because he failed to file a claim for damages with the County pursuant to Wash. Rev. Code §§ 4.96.010 prior to commencing this action. Because the district court did not reach this issue in its order, we will not consider it on this appeal.
 
 
 [11]
 As discussed above, the WLAD does not require a showing of intentional discrimination, however.
 
 
 [12]
 Our adoption of the intentional discrimination standard was premised upon the provisions of the ADA and the Rehabilitation Act requiring the remedies available under those statutes to be construed the same as remedies under Title VI of the Civil Rights Act of 1964. Ferguson, 157 F.3d at 673, (citing 42 U.S.C. §§ 12133 (ADA); 29 U.S.C. §§ 794a(a)(2) (Rehabilitation Act)). The Supreme Court established in Guardians Association v. Civil Service Commission of the City of New York , 463 U.S. 582, 584 (1983), and most recently confirmed in Alexander v. Sandoval, 121 S. Ct. 1511 (2001), that "private individuals c[an ] not recover compensatory damages under Title VI except for intentional discrimination." Sandoval, 121 S. Ct. at 1517.
 
 
 [13]
 The Tenth Circuit had earlier applied a different standard in the ADA context. Rascon v. U.S. West Communications, Inc., 143 F.3d 1324, 1336 (10th Cir. 1998) (adopting good-faith standard); see also Pandazides v. Virginia Bd. of Educ., 13 F.3d 823, 830 n.9 (4th Cir. 1994) (decided before Ferguson and rejecting "discriminatory animus" standard as too high to constitute the discriminatory intent required to recover compensatory damages); Wood v. President & Trs. of Spring Hill Coll., 978 F.2d 1214, 1219 (11th Cir. 1992) (decided before Ferguson, applying bad-faith standard to compensatory damages available under Rehabilitation Act, and suggesting that discriminatory animus jury instruction may constitute error); Carter v. Orleans Parish Pub. Sch., 752 F.2d 261, 264 (5th Cir. 1984) (decided before Ferguson and adopting intentional discrimination or discriminatory animus standard). In light of Powers, we presume that the Tenth Circuit will in the future apply the deliberate indifference standard in ADA cases as well. We also note that the Fourth Circuit has out-right, and the Eleventh Circuit has tentatively, rejected the discriminatory animus standard. The Fifth Circuit's endorsement of the standard as an alternative to intentional discrimination leaves the question of the applicable standard in that circuit, at best, in doubt.
 
 
 [14]
 Especially when the accommodation is provided based upon stereo-typed assumptions about the person's disability, such as the assumption that all hearing-impaired individuals need sign-language interpreters, or all hearing-aid wearers may be accommodated by a sound-amplification system.
 
 
 [15]
 The County defendants do not assert that their failure to accommodate Duvall was inadvertent. Rather, they argue that they are not liable for the failure because it was ultimately Judge Kruse who denied the motion for videotext display made on the first day of trial. The dissent accepts this argument. However, the record reveals that Razey testified that she had the authority to accommodate Duvall; and, indeed, after Razey investigated his grievance and discovered that videotext display was available, the County contracted with a court reporter to provide this service for the remainder of Duvall's court proceedings, and the service was in fact provided. In any event, the possibility that an individual judge might refuse to order, or even permit, an accommodation to be utilized in his courtroom in a particular case would not absolve the County of its responsibility to attempt to comply with the ADA. Morever, according to his testimony, Judge Kruse was not consulted in advance of the trial regarding the obtaining of videotext display; thus, he was not responsible for any failure of those of whom a request was made to provide that service. When Judge Kruse denied the motion for a mistrial that was based on the failure to provide videotext display, he simply ruled that a mistrial was not warranted because the service was not available in Kitsap County. While it appears that he was mistaken as to the availability of videotext display, the judge never suggested that he would not permit its use if it were available. In fact, he said that if, despite its unavailability in the county, Duvall could somehow arrange for videotext display he was free to provide that service for himself. Supra at p. 10795. Thus, it seems clear that Judge Kruse had no objection to the use of videotext display in his courtroom.
 
 
 [16]
 The county defendants also contend that they are powerless to grant Duvall's requested accommodation because of the constraints of Washington's separation of powers principles. However, Washington vests by statute in the county government the responsibility of providing "the court house, a jail or suitable place for confining prisoners, books for record, stationery, lights, wood, attendance, and other incidental expenses of the court house and court . . . ." RCW 2.28.139 (2000). Although judges in Washington appropriately have great latitude in how they conduct specific judicial proceedings, see State v. Hartzog, 96 Wn. 2d 383, 396 (1981), that discretion is not compromised by requiring that those whose statutory duty it is to administer the courts as institutions do so in a manner that comports with federal anti-discrimination statutes. The provision by county officials of physical equipment to litigants who need such assistance would hardly seem to violate separation of powers principles.
 
 
 RYMER, Circuit Judge, dissenting:
 
 51
 Like Judge Kruse, the Court Administrator, Madelyn Botta, is sued for damages and like him, I believe she is entitled to immunity. As the majority recognizes, the judge was performing a judicial function when he declined on the first day of trial (June 21, 1995) to order videotext display for Duvall and when he denied Duvall's motion for a new trial (August 11) based on the absence of real time assistance at trial. Botta's actions were functionally no different. For essentially the same reasons that Judge Kruse is absolutely immune, the Court Administrator should be, too.
 
 
 52
 Duvall argues that Judge Kruse acted in an administrative capacity in denying Duvall's request for accommodation and that "he has no immunity to share with the remaining defendants." The majority holds otherwise with respect to the judge, and I agree. Duvall's argument that Botta lacks immunity stems from the same premise that Judge Kruse was performing an administrative, not a judicial, function, therefore so was the Court Administrator. As we unanimously reject this premise, this should be the end of the matter.
 
 
 53
 Court clerks or administrators are entitled to absolute immunity from liability for damages "when they perform tasks that are an integral part of the judicial process." Mullis v. United States Bankruptcy Court, 828 F.2d 1385, 1390 (9th Cir. 1987) (court clerks have absolute quasi-judicial immunity for filing decision).[1] Here, assuming Duvall's version is true, he approached Botta before trial for videotext assistance at trial. Botta declined to talk to Duvall because he was represented by counsel, but told him to make his request in the form of a motion to the court. Duvall does not dispute that Botta did not have authority to grant his request once litigation was underway. He in fact asked the judge presiding over his divorce for real time accommodation on the first day of trial. The judge denied the request. This was clearly a discretionary judicial decision. See e.g., United States v. Mayans, 17 F.3d 1174, 1181 (9th Cir. 1994) (considering court's withdrawal of interpreter and recognizing trial courts' considerable discretion as to manner in which they protect a defendant's right to testify and to confront witnesses); In re Marriage of Olson, 850 P.2d 527, 529 (Wash. Ct. App. 1993) ("The appointment of interpreter is within the discretion of trial court.").
 
 
 54
 Neither Duvall nor the majority explains why Botta's instruction to take his request to the judge was not part of the judicial process. Nor does either explain why she should not be bound (or least not be properly guided) by the judge's decision at trial when she was later consulted by the county ADA coordinator with regard to Duvall's post-trial request for accommodation at a post-trial hearing.
 
 
 55
 Beyond this, even if Botta had authority to arrange for sign-language interpreters, which is all she ever said, and even if that authority included arranging for other forms of assistive devices for the hearing impaired, as the majority implies, there is nothing in the record or in Washington law to suggest that she was required to use her authority in any particular way in any particular case. Cf. Antoine v. Byers & Anderson, Inc., 508 U.S. 429 (1993) (declining to extend judicial immunity to court reporters who are afforded no discretion in carrying out statutory duty to record verbatim court proceedings in their entirety). Washington law provides for appointment of qualified interpreters to interpret proceedings for a hearing impaired person by an "appointing authority," defined as the "presiding officer or similar official of any court, department, board [etc]." RCW 2.42.120; 2.42.110; see also Washington Court General Rule 11 (providing for use of qualified interpreters in judicial proceedings involving hearing impaired individuals). These statutes contemplate a "determination, on the basis of testimony or stated needs" that the interpreter is able to interpret communication effectively. RCW 2.42.130. I am not sure that these are the statutes to which Botta referred, but regardless, it is evident to me that determinations about the needs of hearing impaired litigants are inherently discretionary judgments, whether made wholly by the presiding judicial officer or partly by his designee.
 
 
 56
 However you slice it, determining whether a particular hearing impaired individual needs accommodation for a court proceeding, and what kind of accommodation is reasonable, entails the power of decision. It is either a judicial function, or comparable to one. It is not administrative,[2] legislative, or executive. Judges may delegate some part of this function to the court administrator or clerk of court, but at the end of the day the function is, and remains, judicial.
 
 
 57
 In addition, Duvall was not without redress for he could appeal the judge's rulings. As the Supreme Court has observed, "[m]ost judicial mistakes or wrongs are open to correction through ordinary mechanisms of review, which are largely free of the harmful side-effects inevitably associated with exposing judges to personal liability." Forrester v. White, 484 U.S. 219, 227 (1988). Duvall does not need, and should not be allowed, to seek damages from a court administrator for an arguably incorrect determination about his needs or the court's ability to address them. This is what appeals are for. To withhold judicial immunity from the clerk in these circumstances permits a party to play the clerk off against the judge, an unseemly as well as unnecessary distraction.
 
 
 58
 Without question, the judge is the final decision-maker with respect to proceedings in his court. RCW 2.28.010. For this reason, aside from immunity, I do not see how Duvall could be injured by any thing Botta did or didn't do, or how Kitsap County, non-court personnel such as Razey and Richardson could have told the judge what to do. Washington judges are state actors, whose authority comes from the state not the county. Wash. Const., Art. IV, §§ 1; see Keenan v. Allan, 889 F. Supp. 1320, 1363 (E.D. Wash. 1995) (judges are officers of Washington State). As we have held in connection with a similar system elsewhere, a county cannot be liable for judicial conduct it lacks the power to control. Eggar v. City of Livingston, 40 F.3d 312, 314-15 (9th Cir. 1994).
 
 
 59
 Accordingly, I would affirm.
 
 
 
 Notes:
 
 
 [1]
 See also Moore v. Brewster, 96 F.3d 1240, 1244 (9th Cir. 1996) (according immunity to clerk of the United States District Court for the Southern District of California given nature of the responsibilities); Sharma v. Stevas, 790 F.2d 1486 (9th Cir. 1986) (clerk of United States Supreme Court has quasi-judicial immunity); Morrison v. Jones, 607 F.2d 1269, 1273 (9th Cir. 1979) (court clerk's "failure . . . to perform a ministerial duty [giving notice of order] which was a part of judicial process is also clothed with quasi-judicial immunity"); Shipp v. Todd, 568 F.2d 133, 134 (9th Cir. 1978) (recognizing quasi-judicial immunity for clerk of Montana state court from damages but not injunctive relief); Harmon v. Superior Court, 329 F.2d 154, 155 (9th Cir. 1964) (recognizing absolute immunity for county clerk and other judicial personnel).
 
 
 [2]
 "Administrative functions are actions which are significant independent of the fact that the actor is a judge, such as the hiring or firing of staff members." Partington v. Gedan, 961 F.2d 852, 866 (9th Cir. 1992) (citing Forrester v. White, 484 U.S. 219, 228-30 (1988)).